**Carmel A. GALLAGHER,**
**Plaintiff–Appellant,**

v.

**George J. DELANEY, Robert A. Hansen, and Consolidated Edison Company of New York, Inc., Defendants–Appellees.**

**Docket No. 97–7726.**

United States Court of Appeals,
Second Circuit.

Argued Feb. 4, 1998.
Decided March 19, 1998.

Kim Berg, White Plains, NY (Jane Bilus Gould, Lovett & Gould, of Counsel), for Plaintiff–Appellant.

Kenneth G. Standard, New York City (Jeanmarie Schieler, Mary Schuette, of Counsel), for Defendants–Appellees.

Before: KEARSE, and WALKER, Circuit Judges, and WEINSTEIN,* Senior District Judge.

WEINSTEIN, Senior District Judge:

Appellant Carmel Gallagher sued her former employer and supervisors charging discrimination in the form of sexual harassment and retaliation. See Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e et seq.; New York Executive Law § 296. The Equal Employment Opportunity Commission issued a Right to Sue letter.

The United States District Court for the Southern District of New York, Charles L. Brieant presiding, granted summary judgment against Gallagher. Rejecting a continuing violations theory, it held: any claims of harassment or retaliation prior to May 3, 1995 were time-barred; there was no actionable sexual harassment after that date; in

---

* Jack B. Weinstein, United States District Court for the Eastern District of New York, sitting by designation.

any event, the employer promptly and adequately took corrective action; and there was no retaliation.

The evidence, viewed in the light most favorable to the appellant, requires a trial. Creating a mosaic with the bits and pieces of available evidence, a reasonable juror might picture either a malign employer using his position to pressure a subordinate for sexual favors or a benign boss trying—however ineptly—to express concern for his secretary in a non-erotic manner that she mistakenly viewed as sexually aggressive. The jury could also find either retaliation for a complaint of sexual harassment or a sensible managerial decision to promptly separate a supervisor and an employee who were incompatible.

## I. INTRODUCTION

"[T]he law of sexual harassment continues to develop at a brisk pace." *Karibian v. Columbia Univ.*, 14 F.3d 773, 777 (2d Cir.), *cert. denied*, 512 U.S. 1213, 114 S.Ct. 2693, 129 L.Ed.2d 824 (1994). So too do the mores of the workplace. *See, e.g., Oncale v. Sundowner Offshore Servs., Inc.*, — U.S. —, 118 S.Ct. 998, — L.Ed.2d — (1998) (same sex discrimination); *Ganzy v. Allen Christian School*, 995 F.Supp. 340 (E.D.N.Y.1998) (history of female sexuality and of women in the workforce); *What Is Sexual Harassment? passim* (Karin L. Swisher ed., 1995) (collecting sharply differing views on what should be proscribed).

Characterizing behavior as sexually harassing can only be accomplished in a specific context. Is it harassing for a supervisor to continually seek to date a subordinate or to compliment him or her on physical attributes or clothing selection? When a boss gives a gift, is it an act of good will or of sexual innuendo? Is behavior deemed inappropriate by an etiquette savant sexual harassment? The answer often depends upon perceptions of the circumstances.

■ A federal judge is not in the best position to define the current sexual tenor of American cultures in their many manifestations. Such an effort, even were it successful, would produce questionable legal definitions for the workplace where recognition of employees' dignity might require standards higher than those of the street.

[N]o principled argument supports the view that sex-based offensive behavior in the workplace is immune from remedy simply because it may be culturally tolerated outside of the workplace. The purpose of Title VII is not to import into the workplace the prejudices of the community, but through law to liberate the workplace from the demeaning influence of discrimination, and thereby to implement the goals of human dignity and economic equality in employment.

*King v. Hillen*, 21 F.3d 1572, 1582 (Fed.Cir. 1994). "[J]udges should be careful to remember that American popular culture can, on occasion, be highly sexist and offensive. What *is*, is not always what is right, and reasonable people can take justifiable offense at comments that the vulgar among us, even if they are a majority, would consider acceptable." *Torres v. Pisano*, 116 F.3d 625, 633 n. 7 (2d Cir.), *cert. denied*, — U.S. —, 118 S.Ct. 563, 139 L.Ed.2d 404 (1997).

■ Today, while gender relations in the workplace are rapidly evolving, and views of what is appropriate behavior are diverse and shifting, a jury made up of a cross-section of our heterogenous communities provides the appropriate institution for deciding whether borderline situations should be characterized as sexual harassment and retaliation.

The factual issues in this case cannot be effectively settled by a decision of an Article III judge on summary judgment. Whatever the early life of a federal judge, she or he usually lives in a narrow segment of the enormously broad American socio-economic spectrum, generally lacking the current real-life experience required in interpreting subtle sexual dynamics of the workplace based on nuances, subtle perceptions, and implicit communications. *See, e.g., United States ex rel. Toth v. Quarles*, 350 U.S. 11, 18, 76 S.Ct. 1, 6, 100 L.Ed. 8 (1955) ("Juries fairly chosen from different walks of life bring into the jury box a variety of different experiences, feelings, intuitions, and habits."); *United States v. Shonubi*, 895 F.Supp. 460, 482–88 (E.D.N.Y.1995) (methods triers of fact em-

ploy in deciding cases), *rev'd on other grounds,* 103 F.3d 1085 (2d Cir.1997).

▪ The dangers of robust use of summary judgment to clear trial dockets are particularly acute in current sex discrimination cases. *Compare Celotex Corp. v. Catrett,* 477 U.S. 317, 327, 106 S.Ct. 2548, 2555, 91 L.Ed.2d 265 (1986) ("Rule 56 must be construed with due regard not only for the rights of persons asserting claims and defenses that are adequately based in fact to have those claims and defenses tried to a jury, but also for the rights of persons opposing such claims and defenses to demonstrate in the manner provided by the Rule, prior to trial, that the claims and defenses have no factual basis."), *and DiLaurenzio v. Atlantic Paratrans, Inc.,* 926 F.Supp. 310, 314 (E.D.N.Y.1996) (determination of whether a workplace is hostile or not is "the sort of issue that is often not susceptible of summary resolution"), *with Meiri v. Dacon,* 759 F.2d 989, 998 (2d Cir.) ("salutary purposes of summary judgment ... apply no less to discrimination cases than to commercial or other areas of litigation"), *cert. denied,* 474 U.S. 829, 106 S.Ct. 91, 88 L.Ed.2d 74 (1985). *See also* Judith Olans Brown, Stephen N. Subrin, & Phyllis Tropper Baumann, *Some Thoughts About Social Perception and Employment Discrimination Law: A Modest Proposal for Reopening The Judicial Dialogue,* 46 Emory L.J. 1487 (Fall 1997).

In this period of rapidly changing and conflicting views of appropriate gender relationships in the workplace, decisions by a jury in debatable cases are sound in policy and consonant with the Seventh Amendment. The facts of this case illustrate the sharp differences in inferences that can be supported, depending upon the trier's hypotheses. *See, e.g., What Is Sexual Harassment? passim* (Karin L. Swisher ed., 1995); *Taking Sides, Clashing Views on Controversial Issues in Human Sexuality passim* (Robert T. Francoeur ed., 2nd ed.1989); Thomas Moore, *At Work, Accentuate the Sensuous,* Newsday, Mar. 9, 1998, at A25; Jeffrey Toobin, *The Trouble With Sex,* The New Yorker, Feb. 9, 1998, at 55. Sexual communications can be subtle or direct. *See, e.g.,* Lee Alan Dugatkin & Jean–Guy J. Godin, *How Fe-*

*males Choose Their Mates,* Sci. Am., Apr. 1998, at 56 ("not a phenomenon unique to humans"); Eckhard H. Hess, *The Role of Pupil Size in Communication,* Sci. Am., Nov. 1975, at 110 (sexual arousal can be detected by measuring automatic increases in pupil size; the person who observes the pupil dilation will react without being aware of the stimulus causing the response); Natalie Angier, *Study Finds Signs of Elusive Pheromones in Humans,* N.Y. Times, Mar. 12, 1998, at A22 (pheromones emitted by women induced hormonal responses in others who were unaware of their odor); JCPenney Spring & Summer '98 Catalog (1998), *available in* http://www.jcpenney.com/jshopping/jcpenney/collections/catalog (clothing, hair accessories, cosmetics, perfumes, and other allures offered to both men and women). Sexual attraction cannot be eliminated, nor does the applicable legislation seek to do so.

## II. FACTS

Gallagher began working for appellee Consolidated Edison as an executive secretary in 1990. In April 1992, she was assigned as secretary to appellee Robert A. Hansen, Con Ed's General Manager for Customer Operations in Westchester County.

The working relationship between Gallagher and Hansen was unexceptional until June 4, 1993, when he told her that he had a dream that she kissed him. Three days later, Hansen gave Gallagher a potted plant. The next day, when Gallagher went into Hansen's office, he told her that, because there were boxes and stacks of paper on the office chairs, the only place for her to sit was on his lap. The following day, Gallagher informed Hansen that his lap comment was totally inappropriate and offensive.

From June 4, 1993 through August 1995, Gallagher alleges that Hansen invited her to lunch on numerous occasions. Though she did dine with him voluntarily on occasion, in keeping with the social climate of the workplace, there were times when she contends she was ordered by Hansen to eat with him and others.

Hansen gave Gallagher gifts of, among other things, jewelry, a Vermont Teddy Bear, a single pink rose, and a book about angels. He sent her cards with handwritten notes that read, for example, "Believe me, your [sic] the last person on Earth I want to see hurt." He complimented her on her physical appearance, gave her days off without charging her personal or sick time, authorized her to use a company car while her automobile was being repaired, asked her "personal" questions, and, Gallagher maintains, told her she brought out feelings in him that he had not had since he was sixteen. She claims that he invited her to Atlantic City, asked her to "keep [her] dance card free" to have lunch with him, and invited her to help him feed the ducks in the pond, since he was "a bachelor for the evening."

Hansen never directly asked Gallagher to engage in sexual relations, but, she contends, his behavior implicitly constituted such a request. He never specifically told Gallagher that her job security, pay, or promotions were contingent on her accepting his gifts, offers, and signs of affection, but she insists that he implied as much when he explicitly reminded her: he was her boss, he wrote her performance reviews, he "had control over [her] career," and all she had to worry about was keeping him happy.

Gallagher concedes that she concurrently was having a consensual sexual relationship with a Con Ed engineer and that she accepted gifts, compliments, and kisses from other Con Ed managers. She also participated in birthday celebrations for Hansen and others, acknowledging that such office celebrations for holidays and birthdays were common.

In February of 1994, or perhaps earlier according to her deposition, Gallagher reported some of her complaints for the first time to Raymond Saracino, Con Ed's Human Resources Manager and Equal Employment Opportunity Officer. She states that Saracino confirmed that Hansen had a romantic interest in her. Saracino, nevertheless, advised her to keep her complaints quiet to avoid creating problems for appellee George Delaney, Vice President of Westchester Con Ed, Hansen's immediate supervisor, but to talk to Delaney. Delaney was responsible for enforcing company policy prohibiting gender discrimination and related offenses. Saracino's recollection is that Gallagher did not want him to speak with Hansen, because she feared that her performance reviews might be adversely affected. Saracino did not discuss these initial complaints with Hansen.

Gallagher next approached Saracino on February 16, 1994, to show him a Valentine's Day card that Hansen had given her; it had a printed message stating, "But somehow it seems only right To say, today of all days, You're someone close in thought and heart, Not 'now and then,' but always." Saracino responded that he did not think the card was inappropriate, and he maintains that he told her she should keep him informed of the situation since he might have to intervene at some point. Gallagher contends that Saracino advised her that if the complaint were dealt with, she would be prevented from taking vacation days unless they were formally scheduled, thus changing the prior informal practice.

Gallagher claims that when she reported Hansen's behavior to Delaney, Hansen's supervisor, he expressed displeasure at her for having first lodged a complaint with Saracino. By contrast, Saracino and Delaney maintain that Delaney assured Gallagher she need not fear retaliation, and she should feel free to refuse lunches with Hansen.

There are no Con Ed records reflecting any of Gallagher's complaints. Delaney concedes that he never put them in writing.

From the fall of 1994 through mid-June of 1995, no alleged harassment occurred. For a substantial part of this period, Gallagher was on sick leave.

During the summer of 1995, Hansen again complimented Gallagher on her appearance, gave her a teddy bear, directed her to go to lunch with him, invited her to Atlantic City, and, as already noted, suggested she help him feed the ducks.

In August of 1995, Gallagher again complained to Delaney. Management then decided to move Hansen to a different floor in the building, away from Gallagher. She contends that it was not made clear to Hansen that Gallagher had a problem with his behav-

ior; Hansen admits he was not aware of Gallagher's concerns until after she filed her EEOC complaint.

Gallagher signed a letter in September of 1995 stating she was satisfied with this action taken to remedy her complaints. Gallagher argues, however, that the fact that there were several drafts suggested that she was really dissatisfied.

Gallagher contends that Hansen's behavior throughout the period during which she was complaining to Delaney and Saracino, and even after he was moved to a different floor, was still harassing. She maintains that Hansen was curt to her, stared at her, and loitered around her work area when meeting with executives in the Vice President's Suite. Moreover, she claims that Saracino told Delaney that she was almost out of sick time and could be terminated if she exhausted this time. This was a change from prior lenient leave allowances.

Gallagher was then re-assigned as a secretary to James O'Toole, director of public affairs, in September of 1995. She continued working for O'Toole until February 1996, taking sick leave in January because of a substance abuse problem. Shortly after she returned from sick leave, she was designated to be the secretary to the manager of financial controls, William Tyrrell. Appellees maintain that this re-assignment was due to O'Toole's dissatisfaction with Gallagher's poor attendance. Gallagher insists that this was a demotion, despite the lack of a change in pay, because the position with Tyrrell was not in the more prestigious Vice President's Suite, and it did not allow her to deal with customers and high level executives to the extent that she had previously. Moreover, Gallagher contends that negative comments in a performance evaluation made by Tyrrell were at odds with her previously positive evaluations and were not verbally revealed to her prior to the written evaluation.

On February 28, 1996, Gallagher filed a complaint with the EEOC. A Right to Sue letter was issued in May of 1996.

In November of 1996, Gallagher was terminated for not reporting to work. She maintains that she could not work because her doctor ordered her not to.

## III. LAW AND ITS APPLICATION

### A. Summary Judgment

 If a reasonable jury might evaluate the evidence to find the material propositions of fact a plaintiff must prove, summary judgment dismissing her suit must be denied. *See, e.g., Schweizer v. Trans Union Corp.,* 136 F.3d 233, 236–37 (2d Cir.1998); *Tomka v. Seiler Corp.,* 66 F.3d 1295, 1304 (2d Cir. 1995). Claims brought under Section 296 of the New York Executive Law, New York's Human Rights Law, can be analyzed, for purposes of determining sufficiency of the evidence, in a manner virtually identical to those under Title VII. *See Reed v. A.W. Lawrence & Co., Inc.,* 95 F.3d 1170, 1177 (2d Cir.1996); *Tomka v. Seiler Corp.,* 66 F.3d 1295, 1304 n. 4 (2d Cir.1995).

### B. Sexual Harassment

 "[S]exual harassment in the workplace violates 'Title VII's broad rule of workplace equality.'" *Karibian v. Columbia Univ.,* 14 F.3d 773, 777 (2d Cir.) (quoting *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 22, 114 S.Ct. 367, 371, 126 L.Ed.2d 295 (1993)), *cert. denied,* 512 U.S. 1213, 114 S.Ct. 2693, 129 L.Ed.2d 824 (1994). Discrimination on the basis of sex with respect to "compensation, terms, conditions, or privileges of employment" is prohibited. 42 U.S.C. § 2000e–2(a)(1). The EEOC Guidelines on "Discrimination Because of Sex" define sexual harassment as occurring when

(1) submission to [unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature] is made either explicitly or implicitly a term or condition of an individual's employment, (2) submission to or rejection of such conduct by an individual is used as the basis for employment decisions affecting such individual, or (3) such conduct has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive working environment.

29 C.F.R. § 1604.11(a). While the Guidelines are not controlling authority, they provide substantial assistance in this area of agency expertise. *See Meritor Sav. Bank, FSB v. Vinson,* 477 U.S. 57, 65, 106 S.Ct. 2399, 2404–05, 91 L.Ed.2d 49 (1986) (sexual harassment case).

▮ Sexual harassment cases can proceed on one of two theories: (1) quid pro quo—*e.g.,* favorable treatment in return for sought sexual favors—or (2) hostile work environment. *See Carrero v. New York City Hous. Auth.,* 890 F.2d 569, 577 (2d Cir.1989); *Karibian v. Columbia Univ.,* 14 F.3d 773, 777 (2d Cir.), *cert. denied,* 512 U.S. 1213, 114 S.Ct. 2693, 129 L.Ed.2d 824 (1994).

### 1. Quid Pro Quo Harassment

#### a. Elements

▮ "[T]o establish a *prima facie* case of *quid pro quo* harassment, a plaintiff must present evidence that she was subject to unwelcome sexual conduct, and that her reaction to that conduct was then used as the basis for decisions affecting the compensation, terms, conditions or privileges of her employment." *Karibian v. Columbia Univ.,* 14 F.3d 773, 777 (2d Cir.), *cert. denied,* 512 U.S. 1213, 114 S.Ct. 2693, 129 L.Ed.2d 824 (1994).

The district court found it "doubtful that [Gallagher], or a reasonable woman of her generation would find Hansen's conduct sexually harassing." While there is much merit to the district court's assessment, a reasonable juror might disagree.

"[W]hether particular conduct was . . . unwelcome presents difficult problems of proof." *Meritor Sav. Bank, FSB v. Vinson,* 477 U.S. 57, 68, 106 S.Ct. 2399, 2406, 91 L.Ed.2d 49 (1986). A jury could find, based on its cumulative perceptions and backgrounds, that requests for sexual activity are not always made explicitly, and that Hansen's failure to directly demand sexual favors as a condition of Gallagher's continued terms of employment did not negate indirect pressure. Gallagher's evidence could support her contention that Hansen said and did things of an erotic nature to which she objected, presenting a factual issue as to whether his conduct was sexually inappropriate and unwelcome. That Gallagher accepted botanical and other offerings from Hansen on occasion does not necessarily demonstrate her amenability to an intimate relationship.

▮ The district court, in assessing Gallagher's evidence, noted that, while working for Hansen, she was a married woman "carrying on a full-fledged office romance with [another] co-employee" and she was a "recreational cocaine user." Neither of these characterizations permits a court to determine, as a matter of law, that a person was receptive to sexual suggestions. *See, e.g., Tomka v. Seiler Corp.,* 66 F.3d 1295, 1307 n. 7 (2d Cir.1995)(sexual harassment victim's drinking could not be equated with consent to the defendants' abusive conduct). *But cf., Meritor Sav. Bank, FSB v. Vinson,* 477 U.S. 57, 69, 106 S.Ct. 2399, 2406–07, 91 L.Ed.2d 49 (1986) (testimony about complaining party's provocative dress and sexual fantasies is relevant in determining if sexual harassment occurred).

Sufficient evidence was produced to present a triable issue on whether Gallagher's complaints about Hansen's conduct were used as the basis for decisions affecting her compensation, terms, conditions or privileges of employment. Gallagher, in her deposition, testified that Hansen indicated to her that he was in a position to afford her leeway in sick, vacation, or personal time; after she complained about his conduct, the leave policy was more rigidly enforced against her. Moreover, Gallagher recalled that Saracino warned that pursuit of her complaints against Hansen could lead to a more formal adherence to Con Ed's absentee policy.

#### b. Employer Liability

▮ In quid pro quo cases, an employer is automatically liable for the harasser's behavior. *See Karibian v. Columbia Univ.,* 14 F.3d 773, 780–81 (2d Cir.), *cert. denied,* 512 U.S. 1213, 114 S.Ct. 2693, 129 L.Ed.2d 824 (1994).

### 2. Hostile Work Environment

#### a. Tenor of the Environment

▮ To establish a claim of hostile work environment, the conduct must have

been "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Sys.*, 510 U.S. 17, 21, 114 S.Ct. 367, 370, 126 L.Ed.2d 295 (1993) (quoting *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 67, 106 S.Ct. 2399, 2405, 91 L.Ed.2d 49 (1986)) (internal brackets and quotations marks omitted). The conduct must be intimidating, hostile, or offensive, with discriminatory intimidation, ridicule, and insult permeating the workplace. *See Tomka v. Seiler Corp.*, 66 F.3d 1295, 1305 (2d Cir.1995). All of the circumstances must be considered; a reasonable person would have to find the environment hostile or abusive, and the victim must have subjectively so perceived it. *See Harris v. Forklift Sys.*, 510 U.S. 17, 21–23, 114 S.Ct. 367, 370–71, 126 L.Ed.2d 295 (1993); *Tomka v. Seiler Corp.*, 66 F.3d 1295, 1305 (2d Cir.1995).

The Supreme Court has recognized the difficulty in precisely defining what will or will not, in the virtually infinite number of varying circumstances, constitute a violation of the statute:

> [T]hat inquiry requires careful consideration of the social context in which particular behavior occurs and is experience by its target.... The real social impact of workplace behavior often depends on a constellation of surrounding circumstances, expectations, and relationships which are not fully captured by a simple recitation of the words used or the physical acts performed. Common sense, and an appropriate sensitivity to social context [are required].

*Oncale v. Sundowner Offshore Servs., Inc.*, — U.S. —, —, 118 S.Ct. 998, 1003, — L.Ed.2d — (1998); *see, e.g., Baskerville v. Culligan Int'l Co.*, 50 F.3d 428, 430 (7th Cir.1995) ("On one side lie sexual assaults; ... physical contact ...; uninvited sexual solicitations; intimidating words or acts; obscene language or gestures; .... On the other side lies the occasional vulgar banter, tinged with sexual innuendo, of coarse or boorish workers.").

The district court was "doubtful that the allegations rise to the level of a hostile work environment amounting to unwelcome sexual conduct which is sufficiently severe to alter the conditions of Plaintiff's employment." Though there is much merit to the district court's perception, reasonable jurors might disagree.

Even assuming that only acts after May 3, 1995 (300 days prior to the EEOC complaint, *see Blesedell v. Mobil Oil Co.*, 708 F.Supp. 1408, 1414–15 (S.D.N.Y.1989) (summarizing law of Second Circuit)) were properly before the court, Gallagher's treatment after that date, particularly in light of sensitivities possibly increased by earlier, arguably objectionable, conduct, could be enough for a reasonable person to find the work environment hostile or abusive.

An Article III judge is not a hierophant of social graces. Evaluation of ambiguous acts such as those revealed by the potential evidence in this case presents an issue for the jury. *See, e.g., Torres v. Pisano*, 116 F.3d 625, 632 n. 6 (2d Cir.) (citing cases from many circuits), *cert. denied*, — U.S. —, 118 S.Ct. 563, 139 L.Ed.2d 404 (1997); *King v. Hillen*, 21 F.3d 1572, 1582–1583 (Fed.Cir. 1994) (administrative board impermissibly substituted its perception of the environment for that of the person claiming harassment); *cf. Torres v. Pisano*, 116 F.3d 625, 631 (2d Cir.) (considering defendant's repeated behavior, it is "patently offensive that [the defendant's employer] is willing to concede ... only 'that several of these incidents as related by plaintiff, if true, were inappropriate, tasteless attempts at humor and conversation, that could be considered not the best behavior by some people'") (emphasis omitted), *cert. denied*, — U.S. —, 118 S.Ct. 563, 139 L.Ed.2d 404 (1997); *Carrero v. New York City Hous. Auth.*, 890 F.2d 569, 578 (2d Cir.1989) ("emphatically" rejecting a defense argument that "[harasser's] conduct, though not a paradigm of modern inter-gender workplace relations, was not pervasive enough to trigger relief, ... and federal law does not punish 'trivial behavior' consisting of only 'two kisses, three arm strokes,' several degrading epithets and other objectionable—but ultimately harmless—conduct"). *But see Baskerville v. Culligan Int'l Co.*, 50 F.3d 428, 431 (7th Cir.1995) (employee's supervisor was a "man whose sense of humor took final

shape in adolescence," and while it is "no doubt distasteful to a sensitive woman to have such a silly man as one's boss, ... only a woman of Victorian delicacy ... would find [his] patter substantially more distressing" than the heat and cigarette smoke in his office).

### b. Employer Liability

■ A plaintiff pursuing a hostile work environment claim must establish a basis, rooted in common law agency principles, on which to hold an employer liable for the conduct of its employees. *See Meritor Sav. Bank, FSB v. Vinson,* 477 U.S. 57, 72, 106 S.Ct. 2399, 2408, 91 L.Ed.2d 49 (1986). This predicate can be established if

> a) the supervisor was at a sufficiently high level in the company, *or* b) the supervisor used his actual or apparent authority to further the harassment, or was otherwise aided in accomplishing the harassment by the existence of the agency relationship, *or* c) the employer provided no reasonable avenue for the complaint, *or* d) the employer knew (or should have known) of the harassment but unreasonably failed to stop it.

*Torres v. Pisano,* 116 F.3d 625, 634 (2d Cir.) (footnotes omitted) (emphasis added), *cert. denied,* —— U.S. ——, 118 S.Ct. 563, 139 L.Ed.2d 404 (1997); *see also Kotcher v. Rosa and Sullivan Appliance Ctr., Inc.,* 957 F.2d 59, 63 (2d Cir.1992).

■ If the evidence creates an issue of fact as to whether an employer's action is effectively remedial and prompt, summary judgement is inappropriate. *See, e.g., Kotcher v. Rosa and Sullivan Appliance Ctr., Inc.,* 957 F.2d 59, 63–63 (2d Cir.1992); *cf. Reed v. A.W. Lawrence & Co.,* 95 F.3d 1170, 1181 (2d Cir.1996) (the "question of whether an employer has provided a 'reasonable avenue of complaint' is a question for the jury;" assessment of the response of the employer to known inappropriate conduct should be by the jury).

■ The district court, assuming for purposes of the summary judgment motion that Gallagher was sexually harassed by Hansen to an actionable level, held that "the employer gave a prompt and adequate response," because, when Hansen's office was moved to a different floor of the building to remedy the situation, "Plaintiff expressed satisfaction with this sensible resolution, but she now claims her assent was coerced." Though there is much merit to the district court's analysis, a jury could disagree on how prompt, appropriate, and adequate was the response. *See, e.g., Snell v. Suffolk County,* 782 F.2d 1094, 1104 (2d Cir.1986) ("Whether an employer has fulfilled his responsibility [to take reasonable steps to remedy a racially discriminatory work environment] is to be determined upon the facts in each case."); *cf. Van Zant v. KLM Royal Dutch Airlines,* 80 F.3d 708, 716 (2d Cir.1996) ("As soon as [the complainant] informed [her supervisor] that she was being sexually harassed ... [her supervisor] took substantial steps to see that [her] complaint was taken seriously.").

Gallagher contends that Saracino did not address her complaints about Hansen promptly and did not confront him directly. While she does not dispute that she wanted her concerns handled discreetly, it is unclear whether she wanted Saracino to initially completely refrain from taking corrective action.

This is a catch–22 situation. If an alleged victim of sexual harassment asks a person of authority to whom she has reported the harassment to keep it confidential, and the employer attempts to reduce the emotional trauma on the victim by honoring her request, it risks liability for not quickly and effectively remedying the situation. *See Torres v. Pisano,* 116 F.3d 625, 639 (2d Cir.) ("[R]esolution will vary from case to case."), *cert. denied,* —— U.S. ——, 118 S.Ct. 563, 139 L.Ed.2d 404 (1997). In evaluating the situation, a reasonable jury might hypothesize that it requires substantial emotional strength for a harassment victim to overcome the embarrassment and intimidation engendered by the abuse, report the harassment endured, and face becoming the subject of office schadenfreude. *Cf.* Michele Ingrassia, *Abused and Confused,* Newsweek, Oct. 25, 1993 at 58 (only 26% of women who say that they have been harassed report such harassment). Too narrow a view of what is appropriate in reacting to an employee's conflicting

needs for protection and for privacy may inhibit well-founded, valid complaints; too broad a view may unreasonably expand employers' duties beyond what Title VII requires and lead to unpleasantly gelid work environments.

Lack of predictability of an ultimate jury reaction might cause employers and employees to be more formal in their workplace relationships than is necessary or desirable, in order to avoid any possible claim of sexual harassment. This disadvantage of imprecision is an unfortunate byproduct of the current uncertainties in a developing area of sociology and law.

In any event, there is a factual dispute as to whether Gallagher did insist to Saracino that the matter remain confidential and that he take no action. It is Saracino's word against Gallagher's. Gallagher also contends that Delaney failed to act on her concerns promptly and effectively and was upset that she had complained to Saracino. Even though Delaney maintains that he quickly and effectively redressed the situation, Hansen himself acknowledged that he was not made aware of Gallagher's displeasure at his attentions until her EEOC complaint had been filed.

While there is much merit to the district court's analysis of the situation, the issue of employer remediation must go to a jury charged with deciding the credibility of witnesses and with drawing appropriate inferences.

C. Retaliation

■ Retaliation claims under Title VII are analyzed under a three-part rule, which is an "allocation of the burden of production and an order for the presentation of proof in Title VII" cases. *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 506, 113 S.Ct. 2742, 2746, 125 L.Ed.2d 407 (1993); *see McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802–04, 93 S.Ct. 1817, 1824–25, 36 L.Ed.2d 668 (1973). On a motion for summary judgment, (1) plaintiff must demonstrate a prima facie case of retaliation, (2) defendant then has the burden of pointing to evidence that there was a legitimate, non-retaliatory reason for the complained of ac-

tion, and (3), if the defendant meets its burden, plaintiff must demonstrate that there is sufficient potential proof for a reasonable jury to find the proffered legitimate reason merely a pretext for impermissible retaliation. *See, e.g., Tomka v. Seiler Corp.,* 66 F.3d 1295, 1308 (2d Cir.1995); *Fisher v. Vassar College,* 114 F.3d 1332, 1335 (2d Cir.1997) (en banc), *cert. denied,* —— U.S. ——, 118 S.Ct. 851, 139 L.Ed.2d 752 (1998).

■ To make out a prima facie case of retaliation, plaintiff must show: 1) participation in a protected activity known to the defendant; 2) an employment action disadvantaging the plaintiff, and 3) a causal connection between the protected activity and the adverse employment action. *See Reed v. A.W. Lawrence & Co., Inc.,* 95 F.3d 1170, 1178 (2d Cir.1996); *Tomka v. Seiler Corp.,* 66 F.3d 1295, 1308 (2d Cir.1995).

■ Gallagher established a prima facie case of retaliation. She participated in a protected activity: she complained to both Delaney and Saracino about the alleged harassment, and she ultimately filed a complaint with the EEOC that issued a letter enabling her to sue. Her action satisfies the first prong of a prima facie case. *See Tomka v. Seiler Corp.,* 66 F.3d 1295, 1308 (2d Cir. 1995).

■ She presented evidence that her subsequent position with Tyrell was, despite salary parity, less prestigious in terms of location and customer interaction. This satisfied the second prong of her prima facie case.

■ The third prong can reasonably be inferred from Gallagher's assertions, accepted as true for summary judgment purposes, that she was allowed liberal sick leave and vacation, worked in a more prestigious position, and received good performance reviews until shortly after she protested Hansen's sexually objectionable words and deeds. *See Reed v. A.W. Lawrence & Co., Inc.,* 95 F.3d 1170, 1178 (2d Cir.1996) (causal connection was shown by, among other things, evidence of a twelve day time span between the initial complaint by plaintiff and her discharge);

*Tomka v. Seiler Corp.,* 66 F.3d 1295, 1308 (2d Cir.1995).

 A prima facie case having been established, Defendants then proffered as a legitimate reason for their actions Gallagher's excessive absenteeism and her job abandonment justifying her re-assignment (which was, Defendants contend, of comparable esteem to her prior position) and ultimate termination. In response, Gallagher points to her satisfactory attendance record under Hansen's informal policies, her medical reasons for missing work, and her positive performance reviews prior to her complaints about Hansen's behavior.

 All that is necessary to permit the case to proceed is evidence sufficient to raise an issue of fact as to whether the Defendants' proffered reason for Gallagher's treatment was a pretext for retaliation. *See Tomka v. Seiler Corp.,* 66 F.3d 1295, 1309 (2d Cir.1995); *Fisher v. Vassar College,* 114 F.3d 1332, 1337–38 (2d Cir.1997) (en banc), *cert. denied,* — U.S. ——, 118 S.Ct. 851, 139 L.Ed.2d 752 (1998). Gallagher was allowed fairly liberal vacation-personal-sick leaves before complaining about her treatment by Hansen, yet "penalized" after her complaints were made. It is not clear why. The intent of the employer is a factually disputed matter precluding summary judgment. *See, e.g., Tomka v. Seiler Corp.,* 66 F.3d 1295, 1309 (2d Cir.1995).

The district court held that "Plaintiff has not presented sufficient evidence to allow a reasonable juror to find retaliation, because there was none." While there is much merit to the district court's assessment, a reasonable juror might disagree.

### D. Time Bar

The district court held that the claims of harassment occurring prior to May 3, 1995 were time barred. Gallagher contends that this erroneously made too short shrift of her continuing violations argument.

The trial court, on remand, may re-consider the issue. This court expresses no opinion as to its resolution. In any event, Gallagher's allegations from May 3, 1995 forward are sufficient to substantiate a claim of sexual harassment and retaliation on this motion for summary judgment. Evidence of occurrences prior to May 3, 1995 may have some evidentiary value. *See Raskin v. Wyatt Co.,* 125 F.3d 55, 65 (2d Cir.1997) ("district court has broad discretion in choosing whether to admit evidence"). *But see Annis v. County of Westchester,* 136 F.3d 239, 246–47 (2d Cir. 1998) (evidence of prior action prejudicial); Bertrand C. Sellier, *Continuing Violation Doctrine in Discrimination Cases,* N.Y.L.J., Mar. 5, 1998, at 1 (dangers to plaintiffs in claiming continuing violations).

### E. Individual Liability

Because the district court did not consider the issue of individual liability with regard to defendants Delaney and Hansen, this question needs to be considered on remand. *See generally Tomka v. Seiler Corp.,* 66 F.3d 1295, 1313–17 (2d Cir.1995) (addressing individual liability under both Title VII and New York Executive Law § 296).

### IV. CONCLUSION

A federal judge cannot determinatively say at this stage of the litigation that Gallagher was or was not subject to sexual harassment and retaliation. The line between the permissible and the impermissible in this case must be drawn by a jury of the appellant's peers.

Reversed and remanded.