Henrietta SCHIRALDI and Michelle Buscaglia, Plaintiffs,

v.

AMPCO SYSTEM PARKING, ABM Industries Incorporated, Victor Windom, Jay Essene and Tyrone Blackwell, Defendants.

No. 96–CV–7311.

United States District Court, W.D. New York.

March 31, 1998.

Nels M. Johnson, Buffalo, NY, for plaintiffs.

Susan M. McClaren, and Brian J. Bergevin, Flaherty, Cohen, Grande, Randazzo & Doren, Buffalo, NY, for defendants.

## DECISION AND ORDER

SIRAGUSA, District Judge.

This is an action in which the plaintiffs are suing their employer for "hostile environment" sexual harassment by a co-worker under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–2(a)(1), negligence and respondeat superior vicarious liability. In addition, plaintiff Schiraldi alleges that she was wrongfully terminated in retaliation for reporting the alleged sexual harassment. The complaint also alleges intentional torts as against defendant Tyrone Blackwell.[1]

Before the Court is an application by defendants AMPCO System Parking, ABM Industries Inc. and Jay Essene for summary judgment, as well as a cross-motion for summary judgment by the plaintiffs. For the reasons that follow, the defendants' motion for summary judgment is granted and the plaintiffs' motion for summary judgment is denied.

## STATEMENT OF FACTS

Both plaintiffs are white females who were employed as cashiers at a parking facility run by AMPCO System Parking at Buffalo International Airport. Tyrone Blackwell is a black male who was employed by AMPCO as a maintenance worker and occasionally as a cashier. Blackwell, Schiraldi and Buscaglia were all co-workers, none of whom occupied a supervisory position with respect to the others. The cashiers at AMPCO's parking lots work in booths at the exits of the lots. In addition to his duties as a cashier, Blackwell would occasionally enter booths occupied by other cashiers in order to perform various maintenance tasks. Both plaintiffs contend that Blackwell sexually harassed them, and that AMPCO knew or should have known of the harassment, but failed to take adequate steps both to prevent the harassment and to discipline Blackwell.

AMPCO had a sexual harassment policy in place at all times referred to herein. Both Schiraldi and Buscaglia admit that they were given a copy of the company's sexual harassment policy when they were hired. That sexual harassment policy states in relevant part:

> Any employee who is subjected to sexual harassment or intimidation is strongly urged and encouraged to promptly bring such harassment or intimidation to the attention of any member of management. All such complaints will be treated in the strictest of confidence and will be promptly investigated.

Both Schiraldi and Buscaglia were also members of the Teamsters Union, Local 264. The collective bargaining agreement between

---

1. It appears from the record that neither Blackwell nor Windom were ever properly served with a summons and complaint and they have not appeared in this action. Accordingly, the causes of action alleged against Blackwell are not addressed in this decision.

AMPCO and the Teamsters contained a non-discrimination clause that stated in relevant part:

> "In accordance with applicable law, the Employer and the Union agree not to discriminate against any individual with respect to hiring, compensation, terms or conditions of employment because of such individual's . . . sex."

The collective bargaining agreement also contained a four-step grievance procedure. The first three steps provided procedures for the employer and the union to work together to resolve any grievance. The fourth and final grievance step allowed the union to seek arbitration in any case where the employer and the union could not agree.

Henrietta Schiraldi was hired as a cashier on February 1, 1994. On December 23, 1994, Schiraldi alleges that Blackwell, who was working as a cashier in an adjoining booth, unexpectedly came into her booth and demanded that she give him thirty dollars. When she refused, Blackwell attempted to remove money from her cash drawer. Then Blackwell grabbed her from behind and rubbed his penis against her buttocks.[2] Schiraldi states that this went on for several minutes, after which she freed herself, grabbed Blackwell by the collar of his coat, and pushed him out of the booth. She claims that Blackwell came back a few minutes later asking for a Christmas present that Schiraldi had for him as well as some food. Although Schiraldi gave him the gift and the food, Blackwell called her "white trash" and "a white scumbag." Later that day, Schiraldi talked to her manager, Victor Windom, but told him only that Blackwell had been in her booth and that she thought he had stolen one dollar out of her cash drawer. She states that the following day, December 24, 1995, she told assistant manager Jay Essene that

Blackwell "wouldn't leave me alone" and "called me names." She did not tell Essene what names Blackwell had called her.

On March 22, 1995, Schiraldi alleges that Blackwell called her a "slut," a "whore," and a "fat pig." She states that she immediately told Jay Essene that Blackwell was calling her names and that she wanted it stopped. The next day, she reported the name-calling incident to Windom. On March 25, 1995, she filed a grievance with the union which included her account of the events that allegedly occurred on December 23, 1994. When Windom was first informed of the allegations, he stated that he did not think Blackwell would engage in such behavior.[3] The company and the union held a meeting on or about March 31, 1995. Present at that meeting were Schiraldi, Blackwell, Windom, union business agent Dan Gale, union steward Barbara Sponholz and union steward Presley Walker. At the meeting, Schiraldi repeated her allegations, but Blackwell denied them. Sponholz then interjected that Blackwell had also made a sexual remark to her, which she had never reported. This was apparently corroborated by another employee. At her deposition, Sponholz testified that as of the date of this meeting, apart from Blackwell's comment to her which she never reported, and apart from Shiraldi's allegations made on March 25, 1995, she did not know of any other incident where Blackwell had engaged in sexual harassment. At the close of the meeting, Windom told Blackwell to stay away from Schiraldi[4] and said that the company would investigate the allegations.

Windom contacted the company's corporate headquarters in Los Angeles and informed them of Schiraldi's allegations. Windom did not tell corporate headquarters about Sponholz's allegation, although it is unclear whether or not this was at Sponholz's request.[5] A representative from AMPCO's

---

**2.** Although it is unclear from the record, it appears that Blackwell was fully clothed during the alleged assault.

**3.** The Plaintiffs' attorney alleges that Windom and Blackwell were "good friends" and "drinking buddies," and that as a result Blackwell was immune from disciplinary action. The only support in the record for this assertion is Sponholz's testimony that Blackwell and Windom may have played tennis. In any event, the plaintiffs' theory

is belied by several disciplinary reports that Windom wrote against Blackwell.

**4.** Schiraldi and Blackwell worked different shifts, so they were only likely to come into contact with each other one day per week.

**5.** Sponholz testified at her deposition that she initially told Windom that she did not want him to use her allegation against Blackwell, because

corporate headquarters then conducted an investigation, which consisted of reviewing Windom's notes, examining time-marked tapes from the cashier's booths where Schiraldi and Blackwell were working on December 23, 1994, and talking by telephone with an employee who came to relieve Schiraldi immediately after the alleged incident. That employee, Daryl Shipp, stated that when he arrived at Schiraldi's booth minutes after the alleged assault, he did not notice anything unusual about Schiraldi's demeanor. The company noted that there were no prior allegations of sexual harassment against Blackwell, that there were no witnesses to the alleged event, that the documentary evidence contradicted her claim, and that Shiraldi waited months to make her complaint. AMPCO then concluded that it could not substantiate Schiraldi's allegation. On April 12, 1995, the company sent a letter to union business agent Gale informing him that no disciplinary action would be taken against Blackwell. That letter stated in relevant part:

After thoroughly evaluating our records and interviewing the appropriate people, we have found the allegations highly unlikely. We have found no indication of wrong doing [sic], therefore no further action will be taken at this time.

Apart from Windom's warning to Blackwell to stay away from Schiraldi, the employer took no further action at that time. However, it is undisputed that there was no further sexual harassment of Schiraldi by Blackwell following the March 25, 1995 meeting.

On July 21, 1995, AMPCO's human resources manager at their corporate headquarters in Los Angeles sent Windom a sexual harassment training program, consisting of a video, participant workbook and leader's guide. The accompanying letter stated in relevant part:

Please schedule training sessions with your employees to review the materials. Let's take this opportunity to instill upon them that it is AMPCO System's policy that all employees be able to work in an environ-

ment free from all forms of discrimination—this includes sexual harassment. Sexual harassment is prohibited by AMPCO System and is against the law.

Sponholz testified that she never saw the video, however she admits that other employees did view the video. AMPCO states that Windom reported that he had conducted the training.

Schiraldi and the union could have pursued the matter to arbitration, but did not. In an affidavit, Gale states:

The grievance was not pursued beyond Step Three of the contractual grievance procedure due to my conclusion that the discussion which took place at the Step Three meeting, the reiteration of the Company's sex harassment policy and the decision to provide additional education to the employees ... would adequately address the situation. At no time has the Grievant Henrietta Schiraldi or any Union steward requested that the Schiraldi grievance be processed to final and binding arbitration under the [collective bargaining agreement].

On April 22, 1995, Schiraldi was suspended from work for three days, as punishment for leaving her work station without a supervisor's permission. Schiraldi alleges that this suspension shows disparate treatment, because Blackwell allegedly committed a similar offense but was not suspended. From the documentary evidence submitted, it is unclear whether or not the two offenses were in fact similar. Schiraldi did not file a grievance over this suspension. On July 28, 1995, Schiraldi was fired by the company after she called Blackwell a "nigger." This comment was made in the presence of assistant manager Jay Essene. Moreover, Schiraldi admits using the epithet. After she was fired, Schiraldi filed a complaint against AMPCO with the New York State Division of Human Rights, regarding the alleged harassment by Blackwell. Schiraldi also filed a grievance with the union. The union arbitrator found that there was just cause to discipline Schi-

it was a private matter between herself and Blackwell, and she had adequately dealt with the

problem.

raldi, although her punishment was reduced to a fifteen-day suspension.

Michelle Buscaglia, the second plaintiff herein, began working at AMPCO on August 30, 1995. She alleges that on September 1, 1995, Blackwell called her "Boo," and said that was a pet name he made up for her. On September 6, 1995, he told her she had "sexy thighs, a nice chest and a nice butt." She said she "laughed off" these comments. On October 11, 1995, Blackwell grabbed her by the hips, said, "come here," and pulled her onto his lap. She told him to leave, and he did. Buscaglia then called her assistant manager, Ed Hardy, and told him, "Please keep Tyrone away from me, he's bothering me." She did not give Hardy any further details. On October 21, 1995, Blackwell asked her for her phone number, so that they could "hook up." She told him she "was in a relationship," but Blackwell said he "believed in fooling around." After that, she said Blackwell continued to give her "looks of a sexual nature," consisting of a smile, with "raised eyebrows, kind of batting his eyes." She states that there were no witnesses to any of these alleged acts. On October 31, 1995, she complained about Blackwell to union steward Sponholz. That same day, she and Sponholz met with Victor Windom, and she told him about the incidents with Blackwell. This was the first time that Buscaglia notified AMPCO management about the details of Blackwell's harassment. Windom interviewed Buscaglia and took notes. Buscaglia and Sponholz then suggested that they have a meeting with Blackwell present to "clear the air."

On or about November 29, 1995, a meeting was held involving Buscaglia, Blackwell, Sponholz, Windom and assistant manager Ed Hardy. At the meeting, Blackwell denied the charges. Windom then reviewed the sexual harassment laws with both Buscaglia and Blackwell, and warned Blackwell that he would be terminated if any sexual harassment continued. Windom then had Blackwell and Buscaglia sign a document acknowledging that they had reviewed the sexual harassment laws. Windom also told Buscaglia that he would work to try to come up with a solution. Within days thereafter, Windom

left AMPCO, and a new manager named Roz McCarter took his place. McCarter discussed Buscaglia's complaints with Windom prior to his departure, and then conducted her own investigation. Additionally, McCarter met with Buscaglia. According to Buscaglia, McCarter told her that she had heard about the allegations of sexual harassment, and that she would take care of it. McCarter then instituted a new policy, whereby all cashiers had to step out of their booths when maintenance personnel entered the booths to work. In December of 1995, McCarter met with Buscaglia and asked her if she was having any more problems with Blackwell. Buscaglia said no. Following the meeting on November 29, 1995, Buscaglia had no further problems from Blackwell. Blackwell was fired on June 25, 1996, for reasons unrelated to any charges of sexual harassment.

## ANALYSIS

A motion for summary judgment may not be granted unless the court determines that there is no genuine issue of material fact and that the undisputed facts warrant judgment for the moving party as a matter of law. *See,* Fed.R.Civ.P. 56(c). The burden of showing that no factual dispute exists rests on the party seeking summary judgment. *Tomka v. Seiler Corp.,* 66 F.3d 1295, 1304 (2d Cir.1995). In assessing the record to determine whether there is a genuine issue of material fact, the court must resolve all ambiguities and draw all factual inferences in favor of the non-moving party. *Id.* On a motion for summary judgment, the court cannot try issues of fact; it can only determine whether there are issues to be tried. *Id.* If there is any evidence in the record from which a reasonable inference could be drawn in favor of the non-moving party on a material issue of fact, summary judgment is improper. *Id.* However, to prevail on a motion for summary judgment, a defendant need only demonstrate the absence of any factual support for an essential element of the plaintiffs' claim. In order then to avoid summary judgment the plaintiff, bearing the burden of proof at trial, must introduce specific facts showing a need for trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–24, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

At the outset, the Court finds that the defendants are entitled to summary judgment as to the plaintiffs' state-law tort claims. The plaintiffs contend that AMPCO and ABM should be held vicariously liable for the intentional torts allegedly committed by Blackwell. The doctrine of respondeat superior renders an employer vicariously liable for a tort committed by his employee while acting within the scope of his employment. *Riviello v. Waldron*, 47 N.Y.2d 297, 302, 418 N.Y.S.2d 300, 391 N.E.2d 1278 (1979). Acts that are within the scope of one's employment are those acts undertaken at the explicit direction of the employer, as well as those "which can fairly and reasonably be deemed to be an ordinary and natural incident or attribute of that act." *Id.* at 302–303, 418 N.Y.S.2d 300, 391 N.E.2d 1278. Since this determination is heavily dependent on factual considerations, it is ordinarily a question for the jury to decide. *Id.* However, where there is no conflicting evidence as to the essential facts, a court may make this determination as a matter of law. *Cepeda v. Coughlin*, 128 A.D.2d 995, 513 N.Y.S.2d 528, (3d Dept.), app. den. 70 N.Y.2d 602, 518 N.Y.S.2d 1024, 512 N.E.2d 550 (1987). In the case at bar, the Court finds as a matter of law that the acts allegedly committed by Blackwell were not within the scope of his employment. Blackwell's position was as a maintenance worker and occasionally as a cashier. Sexual harassment did not fall within the scope of his employment. *See, Ierardi v. Sisco*, 119 F.3d 183, 188 (2d Cir.1997)(Sexual harassment of a female corrections worker by a male corrections officer was not within the scope of his employment). "If in fact the alleged conduct occurred, it was prompted purely by "personal reasons unrelated to the employer's interest." Under such circumstances, the conduct—although occurring during the course of his employment—is outside the scope of [his] employment." *Id.* (citations omitted); *see also, Tomka v. Seiler Corp.*, 66 F.3d 1295, 1318 (2d Cir.1995). Accordingly, the Court finds that AMPCO System Parking and ABM Industries Inc. would have no vicarious liability for the alleged sexual assault by Blackwell.

As for the plaintiffs' causes of action for negligence by AMPCO and ABM, they are barred under state law. New York Workers' Compensation Law § 11 provides an exclusive remedy for aggrieved employees. It is well-settled that negligence claims against an employer arising out of employment are governed exclusively by the Worker's Compensation Law. *Torres v. Pisano*, 116 F.3d 625, 640 (2d Cir.1997); *see also, Chrzanowski v. Lichtman*, 884 F.Supp. 751 (W.D.N.Y.1995). Accordingly, the negligence claims are clearly precluded by the Worker's Compensation Law's exclusivity provision, and must be dismissed.

Moving to the plaintiffs' claims under Title VII, the Court also finds that defendants AMPCO, ABM and Essene are entitled to summary judgment. Title VII of the Civil Rights Act of 1964 makes it "an unlawful employment practice for an employer … to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1). Actions which constitute sexual harassment under Title VII include "[u]nwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature." 29 C.F.R. § 1604.11(a)(1998). For sexual harassment to be actionable under Title VII, it must be sufficiently severe or pervasive "to alter the conditions of [the victim's] employment and create an abusive working environment." *Meritor Savings Bank FSB v. Vinson*, 477 U.S. 57, 67, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986). The "mere utterance of an ethnic or racial epithet which engenders offensive feelings in an employee" would not affect the conditions of employment to a sufficiently significant degree to violate Title VII. *Id.* The federal regulations pertaining to sex discrimination under Title VII state in relevant part: "With respect to conduct between fellow employees, an employer is responsible for acts of sexual harassment in the workplace where the employer (or its agents or supervisory employees) knows or should have known of the conduct, unless it can show that it took immediate and appropriate corrective action." 29 C.F.R. § 1604.11(d)(1998). While this regulation is not controlling authority, it does

provide substantial assistance to the Court. *Gallagher v. Delaney*, 139 F.3d 338, 345 (2d Cir.1998). Moreover, the Second Circuit Court of Appeals has held that where a co-employee is the harasser, an employer will generally not be liable unless the employer either provided no reasonable avenue of complaint or knew of the harassment but did nothing about it. *Tomka*, 66 F.3d at 1305. "Knowledge" of harassment may include constructive notice, i.e. management should have known. *Van Zant v. KLM Royal Dutch Airlines*, 80 F.3d 708, 715 (2d Cir.1996). If the evidence creates an issue of fact as to whether the employer provided a reasonable avenue of complaint, or as to whether the employer's actions were effectively remedial and prompt, summary judgment should be denied. *Gallagher*, 139 F.3d 338, 348.

Accepting as true the plaintiff allegations of physical assault by Blackwell, the Court finds that Blackwell's actions did create a hostile work environment.[6] "[E]ven a single incident of sexual assault sufficiently alters the conditions of the victim's employment and clearly creates an abusive work environment for purposes of Title VII liability." *Tomka*, 66 F.3d at 1305. However, to prevail the plaintiffs must also establish the employer's responsibility for the misconduct, i.e., that the company either provided no reasonable avenue for complaint or that it knew of the harassment but did nothing about it. First, it is undisputed that the employer here did provide an avenue of complaint. Both of the plaintiffs were made aware of the company's sexual harassment policy, both were aware that they could file complaints, and both eventually did file complaints. Any delay in filing their complaints was not the fault of the employer. The plaintiffs do not allege that the employer's established avenue of complaint was unreasonable. The Court therefore finds, as a matter of law, that the employer had a reasonable avenue for complaint in place.

■ Essentially then, the plaintiffs allege that the employer either knew or should have known that the harassment was taking place and failed to take adequate steps both to prevent the conduct and to discipline Blackwell. As to whether the employer knew that harassment was taking place, the Court finds that the plaintiffs have not submitted proof showing that the employer had actual knowledge that sexual harassment was taking place but did nothing about it. As for Ms. Schiraldi, it is undisputed that the company was first notified of her allegation of sexual harassment on March 25, 1995. While it is uncontroverted that Schiraldi made a general complaint about Blackwell to Jay Essene shortly after the incident on December 23, 1994, Schiraldi admits that she told Essene only that Blackwell "wouldn't leave her alone" and had "called her names." The Court finds, as a matter of law, that from these comments alone, the employer could not have known that Schiraldi was being sexually harassed. As for Buscaglia, prior to her filing her complaint, the only comment that she had made to her supervisor was "Please keep Tyrone away from me, he's bothering me." As a matter of law, the Court likewise finds that this comment did not give notice of sexual harassment.

The Court further finds, as a matter of law, that these comments did not provide constructive notice to the employer, because they gave no indication that Blackwell's actions were in any way sexual. In *Murray v. New York University College of Dentistry*, 57 F.3d 243 (2d Cir.1995), a female dental student was being sexually harassed and stalked by a male patient at the dental school.[7] She told one of the school's faculty that the man "stared at her" and "tried to get her attention from across a hallway." *Id.*

---

6. At oral argument on this motion, the defendants conceded, for the purposes of this motion only, that the actions complained of by Schiraldi and Buscaglia would if proven be actionable under Title VII.

7. While *Murray* involves a claim under Title IX, 20 U.S.C. §§ 1681–1688 (1988), it was decided based upon legal principles gleaned from Title VII caselaw. The Court stated that in construing Title IX, "courts have generally adopted the same legal standards that are applied to such claims under Title VII," and "[t]his Court too has looked primarily to Title VII ... in defining the contours of a student's private right of action under Title IX." 57 F.3d 243, 248. Because the Court's holding in *Murray* is based upon Title VII caselaw, it is applicable here.

at 250. The Second Circuit held that the defendant did not have constructive notice, because the plaintiff's comments gave no indication that the man's actions were sexual or part of an ongoing course of harassment. *Id.* Similarly, Schiraldi's statement that Blackwell "wouldn't leave me alone" and "called me names," and Buscaglia's statement "Please keep Tyrone away from me, he's bothering me," gave the employer no indication that Blackwell's actions were sexual. *See, Zimmerman v. Cook County Sheriff's Dept.,* 96 F.3d 1017, 1019 (7th Cir.1996)(Plaintiff "cannot withstand summary judgment without presenting evidence that she gave the employer enough information to make a reasonable employer think there was some probability that she was being sexually harassed"). Moreover, since the women each complained only once, and did not repeat their complaints, there was no way the employer could have known that Blackwell was engaging in an ongoing course of harassment. Nor, is there any evidence in the record suggesting that Blackwell's sexual harassment was so pervasive or continuous that the employer must have known it was occurring. *See, Meritor,* 477 U.S. at 72, 106 S.Ct. 2399. Accordingly, the Court finds that as a matter of law, the employer had no actual or constructive knowledge of Blackwell's actions at any time prior to March 25, 1995 for Schiraldi, or prior to October 31, 1995, for Buscaglia.

As for the remedial measures taken by the employer once it had actual knowledge of the harassment, it is undisputed that when the women notified the employer that harassment of a sexual nature was taking place, the employer immediately convened meetings to investigate the allegations. In both cases, the company warned Blackwell to stay away from the complainants. In both cases, the employer conducted an investigation. After Buscaglia complained, both Victor Windom and Roz McCarter told Blackwell that he would be fired if any harassment continued. Moreover, McCarter instituted a new policy whereby cashiers and maintenance workers would not be alone inside the booths. And in both cases, it is undisputed that there was no further harassment of the plaintiffs. Obviously, the employer's actions

ended the harassment. The Court therefore finds, as a matter of law, that AMPCO's remedial measures were reasonable and adequate to stop the harassment. Since the plaintiffs have not demonstrated either that the defendant employer provided no reasonable avenue of complaint, or that it knew of the harassment and did nothing to stop it, the plaintiffs' claims for hostile work environment sexual harassment must be dismissed.

Schiraldi's claim for retaliation must also be dismissed. Schiraldi's claim that she was fired in retaliation for reporting the sexual harassment must be analyzed under the three-part burden shifting analysis set forth in *McDonnel Douglas Corp. V. Green,* 411 U.S. 792, 802–804, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). In order to make out a prima facie case of retaliation, a plaintiff must show by a preponderance of the evidence 1) participation in a protected activity known to the defendant; 2) an employment action disadvantaging the plaintiff; and 3) a causal connection between the protected activity and the adverse employment action. *Tomka,* 66 F.3d at 1308. If the plaintiff meets this burden, the defendant must then articulate a legitimate nondiscriminatory reason for its actions. If the defendant meets its burden of production, the plaintiff will then have an opportunity to prove that the proffered reason was merely a pretext for retaliation and that the employer's action was prompted by an impermissible motive. *Id.* In the case at bar, the Court finds that Ms. Schiraldi has not made out a prima facie case of retaliation. Specifically, other than conclusory allegations made by the plaintiff's attorney, there is no evidence in the record to suggest any causal connection between her complaint of sexual harassment and her firing. There is, however, ample evidence in the record which establishes that she was fired for cause after calling Mr. Blackwell a "nigger" in front of her supervisor. She was fired in August of 1995, immediately after she used the racial epithet toward Blackwell, five months after she made her complaint against Blackwell. Moreover, it is undisputed that Buscaglia, who also filed a complaint against Blackwell, was not fired or retaliated against in any way. To defeat the motion for

summary judgment, Schiraldi was obliged to produce "sufficient evidence to support a rational finding that the legitimate, nondiscriminatory reasons proffered by the employer were false, and that more likely than not discrimination was the real reason for the discharge." *Van Zant,* 80 F.3d at 714. Mere conclusory allegations will not suffice. *Id.* However, Schiraldi has not come forward with any proof in admissible form to support her allegation. Her claim that this firing was pretextual has no support in the record, apart from the conclusory statements of her attorney. Therefore, because Schiraldi has failed to establish even a prima facie case of retaliation, that claim is dismissed.

Accordingly, the defendants' motion for summary judgment [15] is granted, and the plaintiffs' cross-motion for summary judgment [20] is denied.

So ordered.