Maria LOTOSKY, Plaintiff

v.

THE UNIVERSITY OF ROCHESTER; David Child; Ann Holberton; and Denham Ward, M.D., Defendants

No. 99–CV–6346.

United States District Court, W.D. New York.

Jan. 28, 2002.

John M. Regan, Regan and Regan, Rochester, NY, for the Plaintiff.

Todd R. Shinaman, Nixon Peabody LLP, Rochester, NY, for the Defendants.

## DECISION and ORDER

SIRAGUSA, District Judge.

### INTRODUCTION

Plaintiff filed a complaint in this Court on August 11, 1999, alleging eight different causes of action and seeking compensatory and punitive damages. Her complaint lists causes of action arising under Title VII of the Civil Rights Act of 1964, including an allegation of discriminatory termination from her employment, retaliatory termination of her employment, defendants' alleged failure to accommodate her religious beliefs, and a hostile work environment. She makes similar claims under the New York State Human Rights Law. *See* N.Y. EXEC. LAW § 296. Plaintiff alleges defen-

dants[1] discriminated against her, and ultimately terminated her employment, because of her deeply held religious beliefs as a Roman Catholic. The case is before the Court on defendants' motion for summary judgment. Defendants contend that they are entitled to summary judgment because they allege plaintiff cannot establish the essential elements of her religious discrimination claim, her retaliation claim, her failure to accommodate claim, or her hostile work environment claim. After reviewing all the papers filed in this case in support of the motion and against it by plaintiff, and hearing oral argument, the Court denies defendants' motion (document # 14) for summary judgment.

## BACKGROUND

Defendants filed a Local Rule 56 Statement of Material Facts Not in Dispute (document # 16) with their motion for summary judgment. Local Rule of Civil Procedure 56 states, in pertinent part,

> in any motion for summary judgment pursuant to Federal Rule of Civil Procedure 56, there shall be annexed to the notice of motion a separate, short, and concise statement of the material facts to which the moving party contends there is no genuine issue to be tried. The papers opposing a motion for summary judgment shall include a separate, short and concise statement of the material facts as to which it is contended that there exists a genuine issue to be tried. All material facts set forth in the statement required to be served by the moving party will be deemed admitted unless controverted by the statement required to be served by the opposing party...

The Clerk's docket sheet for this case reveals that plaintiff filed an affidavit and memorandum on January 8, 2001 (documents ##21 & 22), but has not filed a "separate, short, and concise statement of the material facts as to which it is contended that there exists a genuine issue to be tried." Therefore, the facts in defendants' Local Rule 56 Statement are deemed admitted pursuant to the Local rule.

The University of Rochester ("University") hired Maria Lotosky ("plaintiff") in 1988 as a nurse extern, and then as a full-time nurse in 1992. During the time period relevant to this litigation, plaintiff held the nursing position of Research Nurse in the Anesthesiology Department ("Department"). In December of 1997, plaintiff was placed under the direct supervision of Defendant Ann Holberton ("Holberton"), Lead Clinical Research Coordinator. Janet Vaughn ("Vaughn"), a Nurse Practitioner, supervised plaintiff's work and reported to Holberton information relating to plaintiff's work performance. Plaintiff's primary responsibilities as Research Nurse Coordinator were to facilitate research studies and coordinate clinical trials with designated pharmaceutical companies. Her duties included performing procedures as required by protocols, reading patient consent forms, completing case report forms, assisting investigators, and dispensing investigational medications to patients.

It was plaintiff's job responsibility to read to patients of child bearing age a consent form explaining the medical need to use birth control while participating in certain drug studies. It was also plaintiff's

---

1. On March 15, 2001, the Court entered a stipulation and order dismissing with prejudice the causes of action contained in counts 2 (retaliation under Title VII), 4 (hostile work environment under Title VII), 6 (retaliation under the Human Rights Law) and 8 (hostile work environment under the Human Rights Law) of the complaint and all claims against the individual defendants: David Child, Ann Holberton and Denham Ward, M.D.

job duty to explain to patients the implications of not using birth control, and to address any of their questions or concerns. In February of 1998, the University assigned plaintiff to work as Research Nurse Coordinator in the Pain Treatment Center ("Center"), an off-site unit of the Department.

In January of 1998, plaintiff informed Holberton of a conflict between her religious beliefs and her job duties as Research Nurse Coordinator. During her participation in what was referred to as the morphine/guaifensin study, plaintiff expressed reservations to Holberton about reading the patient consent forms. Plaintiff claimed that she could not read the consent forms because certain forms of birth control are proscribed by the tenets of her faith as a Roman Catholic. Plaintiff suggested to Holberton that another nurse could read the consent forms to the patients. However, Holberton informed plaintiff that such an arrangement was a practical impossibility, and then suggested that plaintiff may want to seek a transfer to another position to avoid any conflict between her beliefs and her job duties.

When plaintiff discussed her reservations with Holberton, the only nurse other than plaintiff and Holberton in the department was Kate Grams("Grams"), and neither Holberton nor Grams could perform the patient consent responsibility that was part of plaintiff's job. Holberton was immersed in coordinating her own research studies and supervising the other nurses at the on-site unit of the Department, while Grams was a patient at the Center and a research nurse at the on-site unit of the Department. Both Holberton and Grams had logistical problems in leaving the on-site unit of the Department and traveling to the off-site Center [2] to perform plaintiff's job duties.

Holberton consulted with Susan Powell, Program Administrator, and Defendant David Child to explore possible options or accommodations. They determined that it was not feasible for another nurse to read the consent forms to the patients. They concluded that they would be unable to accommodate plaintiff's request without hiring a new nurse or disrupting the already demanding work schedules of the Department nurses.

Although plaintiff contends that Vaughn could have read the consent forms, Vaughn, as a Nurse Practitioner and plaintiff's supervisor at the Center, would have had to abandon her own job responsibilities of direct patient care and supervision of clinical studies to perform plaintiff's job duties. In addition, the University did not want to pay a Nurse Practitioner's higher salary to perform the job duties of a Research Nurse Coordinator.

Other than Holberton, plaintiff informed none of her other supervisors of the conflict between her religious beliefs and job responsibilities. Plaintiff continued to read the consent forms without any objection. She requested neither a transfer nor a reassignment. The University took no adverse employment action against plaintiff as a result of her discussion with Holberton.

From the outset of her job in the Center, plaintiff's supervisor, Vaughn, observed that plaintiff struggled with her new responsibilities. Vaughn reported that plaintiff committed a potentially dangerous error in a dose conversion of medi-

---

**2.** As stated above, plaintiff was transferred to the off-site center in February 1998; the statement of facts is unclear about the timing of this issue regarding plaintiff's complaint concerning the consent forms and whether it started while plaintiff was working at the on-site center, or the off-site center.

cation. Vaughn also reported that plaintiff failed to take the initiative to familiarize herself with certain protocols and neglected to study a new medication involved in the study. Additionally, there was an incident in which plaintiff dispensed a bottle of medication to the wrong patient. Further, in February of 1998, Holberton discovered that certain medications, such as ephedrine and morphine, were administered to three of plaintiff's patients in deviation of protocol. Although the anesthesiologist, who was the principal investigator in the protocol, actually dispensed the drugs, plaintiff did not remind the investigator that certain drugs were not to be administered in the study even though her job responsibilities expressly called for her to assist the investigators.

Plaintiff repeatedly refused to accept responsibility for her mistakes. When Holberton discovered protocol deviations in the disbursement of medication in the operating room, plaintiff commented that such deviations were the "responsibility of the investigators." By March of 1998, plaintiff's supervisors observed that the quality of plaintiff's work performance had deteriorated significantly. Plaintiff often appeared flustered, disorganized and unable to handle an increased workload. In one incident, plaintiff told a patient that she would bring medication to her home, and forgot to do so. On March 24, 1998, an incident occurred where plaintiff gave a psychotic patient at the Center a crucifix. More specifically, while plaintiff was working on the morphine/dextromethorphan study, one the patients began experiencing delusions and extreme paranoia. Vaughn asked the patient to visit the Center for an evaluation interview to determine whether he should be taken off the drug study. Vaughn reviewed the patient's problems with plaintiff, and asked her to be present during the evaluation interview. During the interview, the patient manifested obvious symptoms of extreme paranoia. Prior to leaving the interview, the patient also asked whether he should "borrow a friend's gun for protection."

After the interview, Vaughn discussed with plaintiff the gravity of the patient's adverse reaction to the medication. When Vaughn left the room, the patient told plaintiff that "he had no one to trust except his church and Christ." He also mentioned "that he did not have a crucifix...." Following this conversation, plaintiff followed the patient to his car in the Center parking lot and gave him a two-inch crucifix. At some point during their conversations, the patient revealed to plaintiff that he was going to "shoot anyone that came on his property" because he believed that "they were going to take something from him." The patient also spoke of his religion and "Christ" during this paranoid state.

On March 27, the patient returned to the Center for a follow up visit and informed Vaughn of plaintiff's actions. The University first gave plaintiff an opportunity to explain her actions in a written statement and then sent her home while the incident was investigated.

On March 31, plaintiff received her job performance evaluation, wherein Holberton documented most of the incidents reflecting plaintiff's poor work performance. Upon receiving the evaluation, plaintiff filed a written grievance with the University in which she blamed her poor evaluation solely on the crucifix incident. Plaintiff did not, however, attribute the evaluation to religious discrimination. Plaintiff did not mention anywhere in the grievance any instances of religious discrimination while employed in the Department. The crucifix episode violated the University's policy on religious practices between patients and nurses, which was in effect at the time.

The policy states: "In times of crisis, decision making, terminal illness, grieving, and whenever spiritual care and counseling can enhance total patient care, the request for consultation should be made through the Chaplain's office."

David Child, Administrator of the Department of Anesthesiology; Ann Holberton, Lead Clinical Research Coordinator; Susan Powell, Program Administrator; Robert Dworkin, Professor of Anesthesiology, Oncology and Psychiatry and an investigator on the study; and Peg Lee, Human Resources Manager, determined that plaintiff's actions toward the psychotic patient represented a serious error in clinical judgment and a breach of her role as an administrative nurse. They believed that her actions threatened the safety of herself, the patient, and other employees at the Center. Plaintiff did not have the authority to treat a patient. Plaintiff was not authorized to offer a patient psychological counseling. Plaintiff had no training in psychological counseling, nor did she ever hold a degree in psychology.

The University decided that the seriousness of plaintiff's conduct, with its potential for harm, in addition to other work performance deficiencies, warranted her placement on administrative leave. On April 15, 1998 plaintiff received a letter stating that her skills did not "fit with the research role needed to be filled within the Department." The University gave plaintiff full pay and benefits for over two months and an opportunity to seek another position within the University. However, plaintiff did not attempt to seek alternative employment with the University.

The University placed plaintiff on administrative leave pursuant to a personnel policy stating that: "Discharge may result when attempts to correct a staff member's misconduct have not been successful, or when misconduct is so serious that imme-diate termination is warranted." In addition: "Termination may also be necessary when a staff member's work performance is unsatisfactory despite training and counseling. If under the circumstances, the staff member does not obtain a transfer to a position for which he or she would better qualify, termination will result. Notice of at least one pay period will be given to the employee, or pay in lieu of notice." Pursuant to this policy, plaintiff was placed on administrative leave on April 15, 1998, and terminated on June 30, 1998.

## DISCUSSION

### 1. SUMMARY JUDGMENT STANDARD

The law on summary judgment is well settled. Summary judgment may only be granted if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). That is, the burden is on the moving party to demonstrate that the evidence creates no genuine issue of material fact. *See Amaker v. Foley,* 274 F.3d 677 (2d Cir.2001); *Chipollini v. Spencer Gifts, Inc.,* 814 F.2d 893 (3d Cir.1987) (*en banc*). Where the non-moving party will bear the burden of proof at trial, the party moving for summary judgment may meet its burden by showing the "evidentiary materials of record, if reduced to admissible evidence, would be insufficient to carry the non-movant's burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 327, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

Once the moving party has met its initial obligation, the opposing party must produce evidentiary proof in admissible form sufficient to raise a material question of fact to defeat a motion for summary judg-

ment, or in the alternative, demonstrate an acceptable excuse for its failure to meet this requirement. *Duplantis v. Shell Offshore, Inc.*, 948 F.2d 187 (5th Cir.1991); Fed.R.Civ.P. 56(f). Mere conclusions or unsubstantiated allegations or assertions on the part of the opposing party are insufficient to defeat a motion for summary judgment. *Knight v. United States Fire Ins. Co.*, 804 F.2d 9 (2d Cir.1986). The Court, of course, must examine the facts in the light most favorable to the party opposing summary judgment, according the non-moving party every inference which may be drawn from the facts presented. *See Doe v. Dep't of Pub. Safety ex rel. Lee*, 271 F.3d 38, 47 (2d Cir. 2001); *International Raw Materials, Ltd. v. Stauffer Chemical Co.*, 898 F.2d 946 (3d Cir.1990). However, the party opposing summary judgment "may not create an issue of fact by submitting an affidavit in opposition to a summary judgment motion that, by omission or addition, contradicts the affiant's previous deposition testimony." *Hayes v. New York City, Department of Corrections*, 84 F.3d 614, 619 (2d Cir.1996). It is equally well settled that in diversity actions, such as the one at bar, federal court sits and operates as if it were " 'only another court of the state,' " and must apply state substantiate law. *GTFM, LLC v. TKN Sales, Inc.*, 257 F.3d 235, 241 (2d Cir.2001) (quoting *Guaranty Trust Co. v. York*, 326 U.S. 99, 109, 65 S.Ct. 1464, 89 L.Ed. 2079 (1945)).

## 2. TITLE VII CIVIL RIGHTS ACT AND NEW YORK HUMAN RIGHTS LAW CLAIMS

Discrimination claims under Title VII of the Civil Rights Act of 1964 ("Title VII") are governed by the three-part analytical framework set forth by the Supreme Court in *McDonnell Douglas Corp. v. Greene*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). "Claims brought under § 286 of New York Executive Law, New York's Human Rights Law, can be analyzed for purposes of determining sufficiency of the evidence, in a manner virtually identical to those under Title VII." *Gallagher v. Delaney*, 139 F.3d 338, 345 (2d Cir.1998) (citations omitted).

Under the *McDonnell Douglas* standard, a plaintiff bears the burden of proof and must ultimately establish, by a preponderance of the evidence: (1) membership in a protected group; (2) qualification for a position; (3) an adverse employment action; and (4) that the adverse employment action occurred under circumstances giving rise to an inference of discrimination. *See Shumway v. United Parcel Service, Inc.*, 118 F.3d 60, 63 (2d Cir.1997).

Requirements for establishing a *prima facie* case are minimal. *See Austin v. Ford Models, Inc.*, 149 F.3d 148, 152 (2d Cir.1998). If a plaintiff is successful in demonstrating her *prima facie* case, then the burden shifts to her employer to articulate a legitimate, non-discriminatory purpose for its adverse employment action. *Id.* at 153 (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973)). The Second Circuit has held that "[a]ny such stated purpose is sufficient to satisfy the defendant's burden of production; the employer does not have to persuade the court that the stated purpose was the actual reason for its decision." *Austin v. Ford Models, Inc.*, 149 F.3d at 153.

Once the employer satisfies its burden, a plaintiff may prevail only if she presents evidence that the employer's proffered reasons are a pretext for discrimination. *Id.* A plaintiff, to demonstrate pretext, must show both that the proffered reason was false and that discrimination was the real reason. *Id.* In applying the *McDonnell Douglas* criteria to a case under the Age Discrimination in Employment Act,

the Supreme Court has held that a plaintiff's *prima facie* case, combined with sufficient evidence for a reasonable fact finder to reject the employer's nondiscriminatory explanation for its decision, may be adequate to sustain a finding of liability for intentional discrimination. *See Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 147, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000). Justice O'Connor, writing for a unanimous Court, said, "[i]n appropriate circumstances, the trier of fact can reasonably infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose." *Id.; see also Jordan v. Olsten Corporation*, No.00–9222, 25 Fed.Appx. 45, 2002 WL 4539, 2001 U.S.App. LEXIS 27415 (2nd Cir. Dec. 20, 2001) (citing *Sanderson* in a Title VII racial discrimination case).

■ Applying these principals of law to the case at bar, the Court finds that for the purpose of the summary judgment application, plaintiff has come forward with sufficient evidence to establish a *prima facie* case.[3] Plaintiff has clearly demonstrated membership in a protected class by reason of her Roman Catholic religion. *See Rosen v. Thornburgh*, 928 F.2d 528 (2d Cir.1991) (central question was whether anti-Jewish animus affected the driving requirement as applied to plaintiff DEA agent). Plaintiff has also met the requirements to show she was qualified for the position to which she had been promoted and has demonstrated an adverse employment action: termination. Plaintiff, relying on circumstantial evidence, states that she was terminated because of an anti-Catholic bias and retaliation for raising her concerns in the grievance process. As the Second Circuit noted in *Rosen*,

> employment discrimination is often accomplished by discreet manipulations and hidden under a veil of self-declared innocence. An employer who discriminates is unlikely to leave a "smoking gun," such as a notation in an employee's personnel file, attesting to a discriminatory intent. *Hollander v. American Cyanamid Co.*, 895 F.2d 80, 85 (2d Cir.1990); *Dister v. Continental Group, Inc.*, 859 F.2d 1108, 1112 (2d Cir.1988). A victim of discrimination is therefore seldom able to prove his or her claim by direct evidence and is usually constrained to rely on the cumulative weight of circumstantial evidence. See *Ramseur v. Chase Manhattan Bank*, 865 F.2d 460, 464–65 (2d Cir.1989); *Hollander*, 895 F.2d at 85; *cf. United States Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 716–17, 103 S.Ct. 1478, 75 L.Ed.2d 403 (1983). Consequently, in a Title VII action, where a defendant's intent and state of mind are placed in issue, summary judgment is ordinarily inappropriate. *See Meiri*, 759 F.2d at 998; *Sweat v. Miller Brewing Co.*, 708 F.2d 655, 657 (11th Cir.1983).

*Rosen*, 928 F.2d at 533.

■ Plaintiff's affidavit is a cogent recitation of the facts upon which she relies to prove a *prime facie* case of discrimination in this matter. With regard to the "crucifix incident," plaintiff references her job duties as a research nurse. Included under "patient care activities" are such responsibilities as "counsels patients/families" and "performs other intervention as necessary." Plaintiff's gift of a crucifix to a psychotic patient is cited by her as an example within these described duties. Defendants first learned of the crucifix incident on March 27, 1998. *See,* Powell aff., document # 18 at ¶ 8. Holberton stated that plaintiff's gift of a crucifix was, "an

---

**3.** Defendants, in their memorandum of law, assumed as much. Defendants' Memoran- dum of Law in Support of its Motion for Summary Judgment at 11.

egregious error in judgment that was the crucial factor in our decision to place her on administrative leave." Holberton aff. at ¶ 21. In an attached electronic mail message dated March 27, 1998, by Janet P. Vaughn to Ann Holberton, Susan Powell, Robert H. Dworkin, Peg Lee, David Child and Fred Perkins, Vaughn related, "today CV [the psychotic patient] returned for follow-up . . . . he thanked me & just before leaving said that the other nurse [plaintiff] was very nice as she was trying to help too . . . as she had given him something. He pulled a 2 inch crucifix out of his pocket saying that [plaintiff] had come out to the parking lot (on 3/24) and given this to him saying that 'it would help to ward off the evil spirits.'" Holberton aff., Exhibit E at ¶ 1–2. Plaintiff was placed on administrative leave on April 15, 1998, and terminated on June 30, 1998. *See,* Holberton aff., Exhibit F. During her deposition, Holberton was asked whether it came to her attention at some point that plaintiff had said the crucifix would "ward off evil spirits?" She explained that she was not personally present when the patient allegedly made that comment to Janet Vaughn. Plaintiff's recitation of the incident does not mention anything concerning evil spirits and there is no affidavit from Janet Vaughn submitted by defendants.

Plaintiff argues in her Memorandum of Law that, "[t]he case at bar is one of those rare cases in which the discriminatory intent is explicit, and there is abundant direct evidence of discriminatory intent from defendants themselves. . . . Defendants, in effect, admit that they discharged Maria because of her religion, and claim that they were justified in doing so, because Maria's practice of her faith amounted to 'poor clinical judgment'." Plaintiff's Memorandum of Law (document # 22) at 5. In her complaint, plaintiff alleges that she worked for defendants over nine years and progressed from patient care nurse to re-

search nurse and was ultimately promoted to research nurse coordinator. Complaint at ¶ 10.

At her deposition, plaintiff related the story of the psychotic patient. In response to a question, she stated, in narrative form, the following:

> And when he left the office that day, he was almost despairing [*sic.*]. I felt really bad for him and I thought well, if this could make him feel better I would give him my Cross. I went to the car and said, you know, "If you want to have this, you can have it."
>
> And he said to me, "This is the nicest thing anybody has ever done."
>
> I said, "You don't have to take it if you don't want it."
>
> He said, "No, no, thank you very much. It shows that someone cares." And that was it . . . .
>
> Well, I told him to go and talk to his minister, maybe his church could help him seeing that he didn't have any other support systems. But he was very upset that day, almost despairing [*sic.*], like he really had nothing. And anyone who came on his property he was going to shoot because he thought that they were going to take something from him. And I thought that, well, if he's Christian, he lives in Christ, maybe if he turns that way and goes to his minister, that way he won't feel so desperate or alone.

Lotosky dep. at 81, 83 (attached to Shinaman aff. as Exhibit B).

The burden of proving a *prime facie* case of discrimination is *de minimis. See, Cronin v. Aetna Life Ins. Co.,* 46 F.3d 196, 203–04 (2d Cir.1995). Plaintiff's suspension, coming as it did in close proximity to the crucifix incident and only three months after she had raised her concerns regarding counseling individuals about birth con-

trol methods contrary to her own Roman Catholic beliefs, sufficiently raises an inference that her termination was based upon religious discrimination.

■■■ Defendants have responded by setting forth a non-discriminatory reason for plaintiff's dismissal. They claim that plaintiff was seriously deficient in carrying out her job responsibilities as described by her performance evaluation dated March 31, 1998, which shows she was evaluated at "Below Standards." Holberton aff. at Exhibit A. Defendants' exhibit also shows that plaintiff's evaluation from November 26, 1996, her last evaluation prior to March 1998, was "Outstanding." Comments on the March evaluation regarding plaintiff's quality and quantity of work are, "Maria does not appear to adapt easily when her workload increases, generating an appearance of disorganization." Under the category "Meets Expectations," defendants wrote, "Maria needs to become more familiar with her protocols and the study medication involved. She recently has been involved in coordinating a study at the Pain Treatment Center, and did not take the initiative to look up the medications that were involved in dose conversions." Functional Performance Evaluation (March 31, 1998) at 3 (attached to Holberton aff. as Exhibit A). Holberton described the dose conversion incident as follows:

> Beginning in February of 1998, plaintiff began to struggle with her new responsibilities at the Center. For example, while overseeing the dose conversion of medication performed by plaintiff, Ms. Vaughn discovered a potentially dangerous error in the conversions. Specifically, plaintiff only calculated the immediate release opioid, not the continuous release opioid. More importantly, Ms. Vaughn reported that upon asking plaintiff about this oversight, plaintiff re-

vealed that she had not taken the initiative to familiarize herself with certain protocols and neglected to study the new medication involved: Kadian.

Holberton aff. at ¶ 4.

In contrast to Holberton's rendition, plaintiff stated in her deposition that she was told by her supervisor, Janet Vaughn, at the beginning of the study, "Don't worry, I'm going to go over the first few with you." Lotosky dep. at 49. Plaintiff claimed that her alleged error in calculation occurred with the first or second patient in the study and that the medication Kadian was not in "the book." Lotosky dep. at 48–49. Plaintiff states that she went to the bookstore and bought a new book, "the 1998 little pamphlet to carry around, little book..." to remedy her unfamiliarity with Kadian. Regarding the calculation, plaintiff claimed that she had performed her calculation and then gave it to Vaughn to write the prescription. Plaintiff noticed when she received the prescription back from Vaughn, and before she faxed it to the pharmacy, that Vaughn had calculated the amount differently. Plaintiff related that she then called both the pharmacist and the pharmaceutical company to determine which calculation was correct. Plaintiff claims that the pharmaceutical company, "said the way I was doing it[,] because I wrote everything down[,] was the correct way, it was the correct calculation." *Id.* at 50. Plaintiff states that she went back to tell Vaughn, and that Vaughn rewrote the prescription. *Id.* Plaintiff also related another incident in which Vaughn performed an incorrect conversion and plaintiff, "caught it before the patient was given the drug." *Id.* at 52.

As to the incident in which plaintiff dispensed a bottle of medication labeled with another patient's name on it, Holberton stated that, "[a]lthough the bottles contained the same medication, they had dif-

ferent instructions." Holberton aff. at ¶ 5. Plaintiff addressed this incident in her deposition, too. She explained that the pharmaceutical representative had told her that each patient in the study would be receiving the same medication and that each medication bottle contained the same dosage of the same medication and she was to take out one of those bottles and provide it to the patient. Lotosky dep. at 55. She also explained that there was a dispute between the Pain Treatment Center and the pharmacy concerning who was going to keep custody of the medication. The dispute ended by having the pharmacy keep the medication and require the nurse to go to the pharmacy to obtain the medication to give to the patient. *Id.* at 55–56. She testified,

> Now one day I had two patients, they were put on the same dose of medication, same drug, same dose, same time, same everything. So I had the first patient, I labeled the top with his name because when the girl from the pharmaceutical company showed the drugs, you put the name on the top, I would put initials on it or something, okay? So I read it to him, he took it at such and such time a [*sic.*] day, and he went home with it, okay?
>
> And so my next patient came in and by chance as I was looking at it I noticed that way up in the left-hand corner in small letters our pharmacy put the patient's name on it. That I wasn't aware that they were doing because usually for studies I would dispense the drug and just put the name on it. And I said, "Oh, I didn't realize that our pharmacy was putting another label on it."
>
> So what I did, I figured well, it's the same drug but still if it has his name on it he should have it. So I drove to the patient's house, I said, "This has your name on it. Even though it's the same drug, same drug [*sic.*], same dose, ev-

> erything, I want you to have the one with your name on it because I didn't realize our pharmacy was putting the names on them."
>
> So I gave him the one with his name on it and the next guy that came I gave him the one with his name on it. They were both on, it was the same dose, same drug, same amount. That's what happened. . . .

Lotosky *dep.* at 56–57.

Concerning the incident in which she, "learned that certain medications, such as ephedrine and morphine, were administered to three of plaintiff's patients in deviation of protocol. . .," Holberton stated, "[W]hile the anesthesiologist, the principal investigator in the protocol, actually dispensed the drugs, it was plaintiff's responsibility, as Research Coordinator, to remind the investigator that certain drugs were not to be administered in the study." Holberton aff. at ¶ 6. However, plaintiff testified at her deposition, that she never had discussions about protocol violations with Ms. Holberton prior to her March 1998 evaluation. She also stated that she did not recall any conversations about reminding physicians that certain medications could not be given with some of the study drugs. Lotosky dep. at 60.

Both sides agree that plaintiff expressed moral reservations about reading a portion of the study consent form concerning birth control methods to the study patients. Plaintiff informed her supervisor, Ann Holberton, that she could not read the consent forms because certain forms of birth control are proscribed by the tenants of her faith as a Roman Catholic. *See* Holberton aff. at ¶ 10. As previously indicated, plaintiff suggested having another nurse read the consent forms to the patients but defendants rejected that suggestion as impractical. *Id.* at ¶¶ 13–16. Ac-

cording to Holberton, the situation was resolved with plaintiff continuing to read the consent forms despite religious objections and that defendants did not take any adverse employment action against plaintiff. *Id.* at ¶ 17.

In her affidavit filed in opposition to defendants' motion, Plaintiff asserts that defendants' claims of undue hardship are, "frankly ridiculous." Lotosky aff. at ¶ 4. Plaintiff cites a memorandum written by Catherine Grams, seven months after plaintiff was terminated,

> who while she had no time to read consent forms to patients, apparently had many hours to pore [*sic.*] over drug studies long since completed in an effort to document 'discrepancies' in my job performance. In an email from Janet Vaughn dated May 28, 1998, she advises Sue Powell that she is busy compiling information that "... may be helpful to have in Maria's file...," this apparently in response to her direction from Ann Holberton in her email dated April 22 that "When the dust settles, could you take a minute (I know it'll take more than one) and document everything our friend didn't do.... I would like to have documentation on hand, because somehow, I just don't think we've heard the last of her.... please let me know if I can help, [']cause I'll come over."

Lotosky aff. at ¶¶ 4, 7. Plaintiff also points out that defendants included this incident as an example of an adverse employment action in her March evaluation, thus, plaintiff disputes that "defendants took no adverse employment actions against plaintiff as a result." Holberton aff. at ¶ 17.

It is obvious to the Court that there are significant material issues which preclude summary judgment in this case. Plaintiff has disputed every one of defendants' claims that she performed in an unsatisfactory manner and has met her burden of proving a *prima facie* case of discrimination. Defendants' non-discriminatory explanation for their adverse employment actions against plaintiff have been sufficiently rebutted by plaintiff and the Court finds, as a matter of law, that issues of fact exist as to whether defendants' proffered reasons were a pretext and that discrimination was a motivating factor in the decision to discharge plaintiff.

## CONCLUSION

For the reasons stated above, defendants' motion (document #14) for summary judgment is denied.