# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-07-00728-CV

**Twigland Fashions, Ltd., Appellant**

**v.**

**Nemia Miller, Appellee**

---

**FROM THE DISTRICT COURT OF TRAVIS COUNTY, 53RD JUDICIAL DISTRICT
NO. D-1-GN-06-002877, HONORABLE STEPHEN YELENOSKY, JUDGE PRESIDING**

---

## O P I N I O N

Twigland Fashions, Ltd. ("Twigland") appeals a judgment awarding one of its former store managers, Nemia Miller, $12,000 in actual damages on a hostile-work-environment theory of gender-based job discrimination through a supervisor's sexual harassment. *See* Tex. Lab. Code Ann. §§ 21.051, .2585 (West 2006); *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 752-54 (1998); *Hoffmann-LaRoche, Inc. v. Zeltwanger*, 144 S.W.3d 438, 445 n.5 (Tex. 2004). In light of that award, the judgment also awarded Miller, as the prevailing party, over $150,000 in attorney's fees. *See* Tex. Lab. Code Ann. § 21.259 (West 2006).

In five issues, Twigland asserts that (1) the evidence was legally insufficient to support a jury submission or finding of its liability under a hostile-work-environment sexual-harassment theory, or it was at least factually insufficient to support that finding; (2) Twigland

conclusively established its *Faragher*/*Ellerth* affirmative defense or that the jury's failure to find for Twigland on that issue was against the great weight and preponderance of the evidence; (3) Miller failed to present legally or factually sufficient evidence that she incurred any compensatory damages; (4) the district court abused its discretion in admitting certain evidence; and (5) the evidence was legally and factually insufficient to support the attorney's fee award given the amount of actual damages awarded. Because we agree with Twigland that the evidence was legally insufficient to support submission of Miller's hostile-work-environment theory of liability, we will reverse and render judgment that Miller take nothing on her claims.

## BACKGROUND

Appellant Twigland is a women's apparel retailer that operates a chain of stores under brand names that include A'GACI.[1] Appellee Nemia Miller was a manager of an A'GACI store in Austin's Highland Mall between October 2004 and December 28, 2005, when she was involuntarily terminated. Throughout Miller's tenure at Twigland, her immediate supervisor was Henry Alonzo. Alonzo was Twigland's regional manager responsible for the Highland Mall store that Miller managed, another Austin store located at the Barton Creek Mall, and seven other stores spread across San Antonio, Laredo, and Eagle Pass. It was Alonzo who informed Miller of Twigland's decision to terminate her, although the parties dispute the extent to which he had any role in that decision.

---

[1] The record indicates that "A'gaci" is a Korean word for an elegant woman. Twigland describes the A'GACI chain's marketing focus as "sell[ing] affordable fashion-forward clothing typically to women ranging from ages fifteen to thirty."

2

Before her termination, it is undisputed that Miller never claimed to anyone at Twigland—or any other person, for that matter—that she had been sexually harassed on the job. Following her termination, however, Miller obtained counsel, who, on March 14, 2006, wrote Twigland's legal department advising of his retention in connection with Miller's termination, "including but not limited to claims of sexual harassment and retaliation, and related claims." On March 28, Miller filed a charge of discrimination with the Austin Equal Employment/Fair Housing Office accusing Alonzo of having sexually harassed her between November 9 and December 28, 2005, the final seven weeks of her tenure at Twigland. According to Miller, Alonzo "would question me regarding my personal, sexual life and experiences," "professed his love for me and told me that I owed him kisses and hugs," and, "[o]n one occasion, . . . came up behind me and grabbed me and wrapped his arms around me and pressed his body against mine." Miller further charged that she "avoided his actions whenever possible and made every effort not to be left alone with him." She attributed her eventual termination—which, she claimed, came "[a]fter approximately two weeks of avoiding" Alonzo—to "retaliation for denying his sexual advances towards me."

After exhausting her administrative remedies, Miller sued Twigland alleging that her firing constituted gender-based employment discrimination through quid-pro-quo sexual harassment, in violation of the Texas Commission on Human Rights Act (TCHRA). *See* Tex. Lab. Code Ann. § 21.051; *Ellerth*, 524 U.S. at 752-54.[2] Miller also asserted a hostile-work-environment theory

---

[2] Miller also asserted what she styled as a separate cause of action for retaliation, alleging that her firing was retaliation for her opposing the "discriminatory practice" of Alonzo's sexual harassment. *See* Tex. Lab. Code Ann. § 21.055 (West 2006) (prohibiting retaliation against a person for "oppos[ing] a discriminatory practice"). However, the district court did not submit retaliation to the jury separately from Miller's quid-pro-quo sexual-harassment theory, and Miller does not complain of that action on appeal.

of gender discrimination through sexual harassment. *See* Tex. Lab. Code Ann. §§ 21.051, .2585; *Ellerth*, 524 U.S. at 752-54; *Zeltwanger*, 144 S.W.3d at 445 n.5. She further pled common-law causes of action against both Twigland and Alonzo individually for assault and battery. Miller sought actual damages, punitive damages, attorney's fees and expert fees. *See id.* §§ 21.2585, .259(a), (c). Twigland responded with a general denial and raised the *Faragher/Ellerth* affirmative defense to Miller's hostile-work-environment claim. *See Faragher v. City of Boca Raton*, 524 U.S. 775, 780, 807-08 (1998); *Ellerth*, 524 U.S. at 765.[3]

Before trial, Miller non-suited her assault claims and proceeded to trial under her TCHRA claims against Twigland. Miller relies on the following evidence in support of the verdict and judgment.

According to Miller, Alonzo's sexually harassing conduct was preceded and accompanied by what she regarded as increasing unjustified criticism of her job performance. She testified that toward the end of 2005 she perceived that Alonzo "would pick on me over little, petty things" related to her store's operations when, at least in her view, there was no merit to his complaints.[4] On November 2, Alonzo gave Miller a written "corrective action" or reprimand after

---

[3] A defending employer may raise the *Faragher/Ellerth* affirmative defense to bar the imposition of vicarious liability for a hostile-work-environment sexual-harassment claim predicated on the actions of a supervisor. The employer must prove by a preponderance of the evidence that: (1) the employer exercised reasonable care to prevent and promptly correct any sexually harassing behavior, and (2) the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise. *Faragher v. City of Boca Raton*, 524 U.S. 775, 780, 807-08 (1998); *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 765 (1998).

[4] Miller cited the example of a complaint from superiors that "my girls [the term she used to identify her store employees] not smiling when I'm completely satisfied with them."

4

an October 22 inventory of revealed that her store had lost 82 pairs of shoes and had a 7.06 percent "shrink rate," or percentage loss of inventory. The document stated various measures that Miller was ordered to take to control shrinkage, including better monitoring of customers in the store and reporting all thefts to police, with an overall mandate to control shrinkage below three percent. At trial, Miller suggested that this three-percent goal was wholly unrealistic, and likely a pretense, because her store was located in a high-crime area and had a history of high shrinkage percentages that she, as store manager, had done much to improve.

Miller claimed that at unspecified times during October or November 2005, Alonzo had made "very light, physical contacts" with her "at times when behind the counter would be overcrowded and I would be taking care of customers" in her store. According to Miller, Alonzo, "would just touch my waist as he walk[e]d past me from behind and sort of like brushed against my behind." Miller acknowledged that "I didn't think anything of it at all" when these contacts occurred. Miller also testified that Alonzo would have her leave the store and accompany him to the Highland Mall food court, where the two would conduct their business meetings because her "store at the time didn't have an office." She complained that during these meetings—which, according to Miller, could last "for hours" because "[w]e would disagree on certain things"—Alonzo "would just put his hand on mine."

Alonzo's actionable sexual harassment, in Miller's view, began on November 9—one week after her November 2 reprimand—while she and Alonzo were conducting one of their business meetings in the Highland Mall food court. According to Miller, "[w]e were discussing other issues that we were having with some of my associates [store employees]," when Alonzo

5

"pause[d] and just suddenly busted out and just asked me, 'So how many men have you slept with Nemia?'" Miller professed "total shock" at the question, but eventually answered it because she "was afraid I was going to lose my job and I was going to be in trouble somehow if I didn't answer him."

Miller also testified that Alonzo "said that he wanted to be friends outside work and for me not to tell anyone, that I have to be quiet about it," adding that remaining quiet was "important because the only friend he's ever had outside work was Anna." "Anna," the evidence reflected, was a former store manager who had been promoted under Alonzo's supervision. According to Miller, she understood Alonzo's remarks to mean that "I was going to get promoted eventually and succeed with the company" if she would agree to be friends with Alonzo outside of work, and if not, "that I was going to lose my job and he was going to make me look bad."

Miller claimed that she was "humiliated" and "completely appalled" by the events during this meeting, to the extent that she "woke up in the middle of the night," and for the first time in her life, began a diary to record her experiences. Twigland introduced the diary into evidence. It is handwritten, with entries that purport to be contemporaneous accounts of events occurring on November 9 and 11 and December 7, 8, 15, and 28, 2005. These dates generally correspond to the timing of incidents with Alonzo to which Miller testified at trial, although the diary omits various alleged acts and details Miller revealed in her courtroom account.[5]

---

[5] For example, Miller's diary summarized the events during her November 9 meeting with Alonzo as follows:

Miller further testified that during a phone conversation at or around the same time—November 11, her diary indicates—Alonzo informed her that she "owed" him "a hug" for failing to comply with instructions from his superior concerning the placement of balloons in her store to alert customers to a sales promotion.[6] Thereafter, Miller claimed, "[w]hen [Alonzo] would come into the store and he would visit" and she or one of her employees would "do something that he wouldn't be happy with," Alonzo, when reprimanding her either during the visit or in a subsequent phone conversation, would tell her, "you owe me a kiss or you owe me two kisses." According to Miller, "as the days went on, I would owe him more and more kisses." Miller acknowledged that Alonzo "didn't say kisses in front of my girls," but would instead signal errors or deficiencies with "you owe me two, three, you owe me four," or "that's five or that's six." Miller understood these statements to refer to Alonzo's escalating count of "kisses."

Following Alonzo's November 9 store visit and November 11 phone conversation, the next alleged act of which Miller complained occurred on December 7. On that day, Alonzo visited Miller's store, accompanied by Twigland president John "Mr. John" Won. Won would periodically visit the store to evaluate first-hand its cleanliness, presentation, and employee

---

> Today is the first day that Henry had asked me about things that are more personal. He wanted to know how many men I've slept with. I was really embarrassed . . . but I told him [answer redacted]. He then said that we can be friends, but no one else will know . . . what does that mean?? I don't know . . . I must be stupid??

(Ellipses in original.)

[6] As before, Miller characterized the infraction as minor and insignificant.

performance.[7] Miller testified that "Mr. John was helping us with putting stickers on the shoes" in a retail area of the store and sent her to retrieve more stickers from a back storeroom. According to Miller, "Henry [Alonzo] followed along, as if he was going to help me get the stickers." Then, while Miller was "kind of like halfway bent down looking for the shoe stickers down below on the shelves," Alonzo, without warning, "came up right behind me and just gave me this really tight hug" while uttering "some comment about the holiday." Miller claimed that "all of his body" came into contact with hers, with his arms "in front of me," in a manner that "I would probably get from a spouse or a boyfriend." The embrace "lasted like maybe a second or so" before Miller "broke loose as fast as I could." A few minutes later, when Miller returned to the storeroom to retrieve more stickers for Mr. John, Alonzo, according to Miller, "did the same thing again."[8] Miller claimed she "told myself never to go back in that stock room with Henry again." On neither occasion, Miller testified, did she complain to Mr. John about Alonzo's alleged actions, claiming that "I was scared that Mr. John was going to take his side."

On the following day, December 8, which had been one of her scheduled days off, Miller testified that Alonzo called her and told her to meet him at her store at a designated time.[9] Miller, who was with her minor daughters that day, failed to arrive at the store until thirty minutes

---

[7] Miller observed that "dust bunnies" were a particular concern of Mr. John, as were store employees' "energy" and friendliness with customers.

[8] In her diary version of these events, Miller states only that "I went to the back looking for 'sale' stickers & Henry followed along. To my surprise he hugged me from the back. That was weird. Does that mean that he's throwing me hints? Or being perverted? He did that twice today . . . ." (Ellipsis in original.)

[9] Miller added that the roads were icy that day.

after the appointed time.  By this time, Alonzo had to leave for the Barton Creek store.  He ordered Miller to meet him there, indicating, according to Miller, that "[w]e need to meet about your visit [from Mr. John].  Your visit went very, very bad."  After Miller arrived at Barton Creek Mall, the pair met in a public area near Nordstrom while Miller's daughters excused themselves.  During the meeting, according to Miller, Alonzo insisted that Mr. John's store visit had gone poorly while Miller "kept telling him, I don't understand.  I don't understand.  What's so bad about the visit?"  According to Miller, the conversation grew heated, and Alonzo at one point suggested that mall onlookers would think they were having a "lover's quarrel."  During the exchange, Miller claimed, Alonzo "just kept pounding on the table.  He's like, You don't get it, do you?  You don't get it, do you, Nemia?"  Miller testified that she eventually acknowledged that "I don't get it" and asked Alonzo to explain, after which Alonzo "finally calmed down [and] sat back down again.  And he said, You know I love and I care about you."  Miller claimed that she inquired, "What exactly do you mean by that, sir?" to which Alonzo responded, "It's just business" and, "Obviously, you don't feel the same."  Before the meeting concluded, Alonzo, according to Miller, "said that I owed him another kiss and that he would get those kisses when I least expected."[10]  At some point that day,

---

[10]  Miller's diary reflects the following events during her meeting with Alonzo:

> He kept telling me that I just don't get what I did wrong, why my visit was bad, that I don't understand.  I agreed & I asked him to tell me why?  He said it was because my girls aren't energetic enough, not loud enough w/call outs [a security measure through which store employees kept track of customers in the store] (which I thought we did well).  He said that Mr. John said that he deserves better than what or how my team & I performed during the visit.  During our long meeting he mentioned that he cares about me & that he loves me several times.  I at this time wasn't comprehending his meanings.  Then he said that he knows that the feelings are mutual.  I then reacted & asked "What does that mean?"  He said that he loves me

Miller acknowledged (and wrote in her diary) that Alonzo "gave me my write up for going over payroll hrs" and admitted at trial that "it was fair for Mr. Alonzo to write [her] up" for this.

A week later, on December 15, Alonzo visited Miller's store again, accompanied by Debe Lavarius, Alonzo's immediate superior. In her diary, Miller acknowledged that "Debe was furious" because Miller had permitted members of her lower-management team to take time off during the holiday season, leaving the store shorthanded during one of its busiest times of the year. Miller wrote that this was one of the occasions in which Alonzo counted "kisses":

> Henry also mentioned in the store that because I screwed up again . . . this time I owe him 6 kisses. I don't know where his #'s are coming from but last time I remembered him talking about it, I thought he said that I owed him 4 kisses, for what? I don't know . . . I don't really pay attention to him anymore when he starts talking nonsense.

(Ellipses in original.) At trial, Miller recounted that Alonzo's exact statement, made within hearing of others, was that she "owed him six" because she had understaffed her store during the holiday season.

Miller was terminated three days after a Christmas Day incident in which she had failed to promptly respond to a cell-phone call from Brinks, the company that monitored the

---

> & cares about me & wants me to do well, & that he doesn't think I care about respecting him, because my team's reaction to the visit was very disrespectful. I'm still lost, he keeps going around & around. I'm kinda confused. Then when we were ending our conversation or meeting, he said that I owe him a kiss for putting him through what I've put him through[,] that he will kiss me when I least expect it . . . I just laughed along, not knowing how to react to this incident.

(Ellipsis in original.)

10

security alarm at her store, notifying her that the alarm had been triggered.[11] After a four-hour delay, Miller called Brinks but could not obtain information regarding the nature or cause of the alarm because she could not provide Brinks with Twigland's security password.[12] It is undisputed that Miller did not take further steps that day to secure the store's inventory, such as calling other Twigland employees to obtain the security password or requesting assistance from Austin police or mall security. Instead, "hoping for the best," as Miller put it at trial, she waited until the following work day to check on the store. Although it ultimately turned out that no inventory had been lost, the decision was made by or in consultation with Mr. John (it was disputed whether Alonzo had a role in the decision) that Miller should be terminated. Alonzo met with Miller on December 28 and delivered the news. Miller claims that Alonzo cried during their meeting; said, "Why did you have to screw up like this? I had so many plans for us;" and told her that he had wanted to take her to the Oasis.[13]

Alonzo denied ever harassing Miller, and Twigland attempted to raise the inference that she had fabricated her accounts after she was fired. Twigland emphasized that the first time Miller divulged any allegation of sexual harassment to anyone at Twigland was when her lawyer wrote the company approximately two-and-a-half months after her termination. Miller also acknowledges that she had not revealed Alonzo's alleged harassment to anyone, including

---

[11] It later turned out that a back door had come open.

[12] There was evidence that Miller had previously been provided a universal password to be used in obtaining information from Brinks in the event the store alarm was activated.

[13] The Oasis is an Austin-area restaurant and bar overlooking Lake Travis that is known for its sunset views.

her husband or fellow employees with whom she was friends, while she was employed by Twigland. Miller insisted, however, that she had been intimidated by the perception that Alonzo was close to Mr. John. Twigland also presented evidence that Alonzo and others at Twigland commonly used "love" as an informal term of affection (e.g., Alonzo emailing his stores urging "I LOVE WORKING WITH ALL OF YOU" and receiving the response "WE LOVE YOU HENRY") and that Miller termed her store's personnel "The Hot Mamas" and divulged in email such intimacies as an upcoming visit to her "gyno". Twigland also presented evidence that Alonzo had a practice of awarding *candy* kisses for good employee performance, suggesting that any references to kisses Miller allegedly "owed" him merely signified that she was accruing negative candy kisses for poor job performance.

Twigland also elicited admissions from Miller that Alonzo had never sexually solicited her, asked her to have sex with him, made a sexual advance toward her, or actually attempted to kiss her. She further conceded that despite Alonzo's alleged conduct during November and December 2005, it had not impacted her job performance and that, to the contrary, she perceived her performance had bested that of Alonzo's other store managers and was actually improving. In fact, Miller's store was named Twigland's "Store of the Month" for December 2005. On the other hand, Miller maintained that Alonzo's conduct made it "harder" for her to do her work while he was in the store, elaborating, "Whenever he was in the store I would inquire about what he's going to do next, what's going to happen now. And I would constantly think about that and worry about that, that I wasn't effective at all with work." However, Miller conceded that these impediments arose only "[w]hen [Alonzo] was in the store, but not when he was actually not in the store," and that

12

Alonzo (who was responsible for nine stores spread between Austin and Eagle Pass) was in her store only once or twice per month. However, Miller claimed that when Alonzo did visit her store, he typically stayed "[a]n entire day," and she suggested that this was somewhat longer than his visits to other stores with male managers.

The district court submitted to the jury both Miller's quid-pro-quo liability theory (whether Miller was "subjected to unwelcome sexual advance(s) or demand(s)" by Alonzo and that her "submission to or refusal to submit" to such advances or demands was a "motivating factor" in her termination), her hostile-work-environment theory, and Twigland's *Faragher*/*Ellerth* affirmative defense to vicarious liability under Miller's hostile-work-environment theory. *See Faragher*, 524 U.S. at 807-08; *Ellerth*, 524 U.S. at 765. The jury failed to find Twigland liable under Miller's quid-pro-quo theory. However, it found Twigland liable under the hostile-work-environment theory and failed to find that Twigland had established both elements of its *Faragher*/*Ellerth* defense. As compensatory damages for the discrimination it found, the jury awarded Miller $12,000. However, the jury failed to find unanimously that Twigland had acted with malice or reckless indifference with respect to Miller's right to be free of such discrimination, precluding the jury from awarding Miller punitive damages.

Miller's claim for attorney's fees and expert fees was tried to the district court, which awarded Miller $113,625 in reasonable and necessary trial-level attorney's fees, $35,000 in contingent appellate fees and $1,440 in expert-witness fees. The court entered findings of fact and conclusions of law in support of these awards. The district court subsequently rendered final judgment awarding Miller the actual damages awarded by the jury, prejudgment and post-

13

judgment interest on that amount, plus the attorney's fees and expert fees the court had found. This appeal ensued.

## ANALYSIS

Twigland brings five issues on appeal, contending that (1) the evidence was legally insufficient to support the jury submission of Miller's hostile-work-environment theory and legally and factually insufficient to support the jury's finding on that issue; (2) the evidence conclusively established Twigland's *Faragher*/*Ellerth* affirmative defense to Miller's hostile-work-environment theory or the jury's contrary finding was against the great weight and preponderance of the evidence; (3) the evidence was legally and factually insufficient to support the jury's award of any compensatory damages to Miller; (4) the district court's award of almost $150,000 in attorney's fees to Miller on her mere $12,000 actual-damages recovery was excessive and not supported by legally or factually sufficient evidence; and (5) that the district court abused its discretion in admitting certain evidence of Alonzo's conduct involving other Twigland employees. We need only consider Twigland's first issue, as it is dispositive.

We will sustain a legal-sufficiency complaint if the record reveals: (a) the complete absence of a vital fact; (b) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact; (c) the evidence offered to prove a vital fact is no more than a mere scintilla; or (d) the evidence establishes conclusively the opposite of the vital fact. *City of Keller v. Wilson*, 168 S.W.3d 802, 810 (Tex. 2005). The ultimate test for legal sufficiency is whether the evidence at trial would enable reasonable and fair-minded people to reach the verdict under review. *See id.* at 827. We review the evidence in the light favorable to the verdict, crediting

14

favorable evidence if reasonable jurors could and disregarding contrary evidence unless reasonable jurors could not. *See id.* at 807.

When the evidence offered to prove a vital fact is so weak as to do no more than create a mere surmise or suspicion of its existence, the evidence is less than a scintilla and, in legal effect, is no evidence. *Ford Motor Co. v. Ridgway*, 135 S.W.3d 598, 601 (Tex. 2004). But more than a scintilla of evidence exists if the evidence rises to a level that would enable reasonable and fair-minded people to differ in their conclusions. *Id.*

When reviewing a challenge to the factual sufficiency of the evidence supporting a vital fact, we must consider, weigh, and examine all of the evidence in the record, both supporting and against the finding, to decide whether the verdict should be set aside. *Plas-Tex, Inc. v. U.S. Steel Corp.*, 772 S.W.2d 442, 445 (Tex. 1989); *Pool v. Ford Motor Co.*, 715 S.W.2d 629, 635 (Tex. 1986). We should set aside the verdict only if the evidence that supports the jury finding is so weak as to be clearly wrong and manifestly unjust. *See Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986). But we may not merely substitute our judgment for that of the jury. *Pool*, 715 S.W.2d at 635. The jury remains the sole judge of witnesses' credibility and the weight to be given their testimony. *Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 761 (Tex. 2003).

The TCHRA provides administrative remedies against "unlawful employment practices," and, once those remedies are exhausted, judicial remedies including recovery of certain damages, equitable relief, and attorney's and expert-witness fees. *See* Tex. Lab. Code Ann. §§ 21.201-.262 (West 2006). The TCHRA's general prohibition against "unlawful employment practices," section 21.051 of the labor code, provides, in relevant part:

An employer commits an unlawful employment practice if because of race, color, disability, religion, sex, national origin, or age the employer:

(1)     fails or refuses to hire an individual, discharges an individual, or discriminates in any other manner against an individual in connection with . . . the terms, conditions, or privileges of employment . . . .

*Id.* § 21.051. Section 21.051 is modeled on and "'is substantively identical to its federal equivalent in Title VII' but adds age and disability to the protected categories." *Texas Parks & Wildlife Dep't v. Dearing*, 240 S.W.3d 330, 349 n.7 (Tex. App.—Austin 2007, pet. denied) (quoting *Quantum Chem. Co. v. Toennies*, 47 S.W.3d 473, 475 (Tex. 2001)); *see* 42 U.S.C.A. § 2000e-2(a)(1) (West 2003) ("[I]t shall be an unlawful employment practice for an employer . . . to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin . . . ."). The legislature intended that the TCHRA "'correlat[e] . . . state law with federal law in the area of discrimination in employment,'" *Dearing*, 240 S.W.3d at 351 (quoting *Schroeder v. Texas Iron Works, Inc.*, 813 S.W.3d 483, 485 (Tex. 1991)), and "'coordinate and conform with federal law under Title VII . . . ,'" *id.* (quoting *Caballero v. Central Power & Light Co.*, 858 S.W.2d 359, 361 (Tex. 1993)). Thus, we may look to federal case law under Title VII when construing its Texas counterpart. *Zeltwanger*, 144 S.W.3d at 445-46.

The statutory focus of labor code section 21.051, like Title VII, is employer conduct that "discriminates . . . against an individual in connection with . . . *the terms, conditions, or privileges of employment*." With regard to gender discrimination, the U.S. Supreme Court has

recognized that the phrase "terms, conditions or privileges of employment" is not limited to "'terms' and 'conditions' in the narrow contractual sense, but 'evinces a congressional intent to strike at the entire spectrum of disparate treatment of men and women' in employment.'" *Oncale v. Sundowner Offshore Servs.*, 523 U.S. 75, 78 (1998) (quoting *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 64 (1986) (citations and internal quotation marks omitted)).

While potentially actionable under other civil-liability theories, such as common-law assault, or even prohibited by the criminal law, sexual harassment—"unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature," *Vinson*, 477 U.S. at 65—does not in itself constitute "discriminat[ion] . . . against an individual in connection with . . . the terms, conditions, or privileges of employment" "because of . . . sex." However, sexual harassment can affect a "term, condition, or privilege" of a plaintiff's employment, and thereby constitute an actionable "unlawful employment practice," in two general ways: (1) the employer takes a "tangible employment action" (i.e., explicitly alters terms, conditions, or privileges of employment) based on whether the employee submits to a sexual demand; or (2) while not culminating in a tangible employment action, sexual harassment is nonetheless said to constructively alter the employee's terms or conditions of employment. *See Ellerth*, 524 U.S. at 752-54; *Zeltwanger*, 144 S.W.3d at 445 n.5. The former circumstance or theory is termed quid-pro-quo sexual harassment, the theory that the jury rejected here; the latter is the hostile-work-environment theory under which Twigland was found liable.

Consistent with the statutory focus on discriminatory employment terms and conditions, a plaintiff asserting a hostile-work-environment sexual-harassment theory of job

17

discrimination against her employer has the burden of establishing not only that: (1) she is a member of a protected class (e.g., a woman); (2) she was the victim of uninvited sexual harassment; and (3) the harassment was based on sex; but also that (4) the harassment affected a "term, condition, or privilege" of her employment. *See Harvill v. Westward Commc'ns, L.L.C.*, 433 F.3d 428, 434 (5th Cir. 2005). Further, to hold her employer vicariously liable, the plaintiff must also prove (5) her employer knew or should have known of the harassment and failed to take prompt remedial action. *Id*. However, where, as here, a hostile-work-environment sexual-harassment claim is predicated on actions by the plaintiff's supervisor, the plaintiff need not prove the fifth element; instead, the burden is shifted to the employer to defeat vicarious liability by proving the *Faragher/Ellerth* affirmative defense. *Faragher*, 524 U.S. at 802-08; *Ellerth*, 524 U.S. at 765. On appeal, Twigland challenges the sufficiency of the evidence supporting the fourth element, whether any harassment by Alonzo affected a "term, condition, or privilege" of Miller's employment.

"[N]ot all workplace conduct that may be described as 'harassment' affects a 'term, condition or privilege' of employment." *Vinson*, 477 U.S. at 67. As the U.S. Supreme Court has explained, in regard to Title VII:

> Title VII does not prohibit genuine but innocuous differences in the ways men and women routinely interact with members of the same sex and of the opposite sex. A recurring point in [our] opinions is that simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment. These standards for judging hostility are sufficiently demanding to ensure the Title VII does not become a general civility code.

18

*Faragher*, 524 U.S. at 788 (citations and internal quotation marks omitted). Such matters are instead left to other legal theories or protections, employer policies and practices, or social opprobrium.

The core concept of the hostile-work-environment sexual-harassment theory is that sexual harassment has created an *environment* that, through the impact it would have on the victim, can be said to discriminatorily alter a "term, condition, or privilege" of employment. *See Ellerth*, 524 U.S. at 751-52; *Wal-Mart Stores, Inc. v. Itz*, 21 S.W.3d 456, 473 (Tex. App.—Austin 2000, pet. denied) ("The critical inquiry is the *environment* . . . .") (quoting *Soto v. El Paso Natural Gas Co.*, 942 S.W.2d 671, 678 (Tex. App.—El Paso 1997, writ denied)). Sexual harassment is said to affect a term, condition, or privilege of employment when "the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (citations and internal quotation marks omitted). In other words, sexual harassment is sufficiently "severe" or "pervasive" to alter the terms, conditions, or privileges of the victim's employment when it can be said to create an "abusive working environment." *See id.* at 24 (Scalia, J., concurring) ("'[A]busiveness' is . . . the test of whether legal harm has been suffered . . . .").

The Supreme Court has described the "abusiveness" standard as requiring "extreme" conduct, *Faragher*, 524 U.S. at 788, but not necessarily any tangible psychological impact on the victim. *See Harris*, 510 U.S. at 21. Rather, abusiveness is said to "take[] a middle path between making actionable any conduct that is merely offensive and requiring the conduct to cause a tangible psychological injury." *Id.* The idea is that:

19

> A discriminatorily abusive work environment, even one that does not seriously affect employees' psychological well-being, can and often will detract from employees' job performance, discourage employees from remaining on the job, or keep them from advancing in their careers. Moreover, even without regard to these tangible effects, the very fact that the discriminatory conduct was so severe or pervasive that it created a work environment abusive to employees because of their race, gender, religion, or national origin offends Title VII's broad rule of workplace equality.

*Id.* at 22; *see Oncale*, 523 U.S. at 80 ("'The critical issue, Title VII's text indicates [and the same is true of labor code section 21.051], is whether members of one sex are exposed to disadavantageous terms or conditions of employment to which members of the other sex are not exposed.'") (quoting *Harris*, 510 U.S. at 25 (Ginsburg, J., concurring)); *Harris*, 510 U.S. at 25 (Scalia, J., concurring) ("[T]he test is not whether work has been impaired, but whether working conditions have been discriminatorily altered."). The concept is that sexual harassment rises to a level that is so "extreme" and "abusive" that it deprives the victim of equal opportunity in the workplace. *See Meritor*, 477 U.S. at 67 ("'Sexual harassment which creates a hostile . . . environment for members of one sex is [an] arbitrary barrier to sexual equality at the workplace . . . .'"); *DeAngelis v. El Paso Mun. Police Officers Ass'n*, 51 F.3d 591, 593 (5th Cir. 1995) (purpose of hostile-work-environment sexual-harassment claim "is to level the playing field for women who work by preventing others from impairing their ability to compete on an equal basis with men. . . . A hostile environment claim embodies a series of criteria that express extremely insensitive conduct against women, conduct so egregious as to alter the conditions of employment and destroy their equal opportunity in the workplace.").

Whether conduct is sufficiently "extreme" to create an "abusive" work environment is to be viewed from both an objective and subjective standpoint. "Conduct that is not severe or

pervasive enough to create an objectively hostile or abusive working environment—an environment that a reasonable person would find hostile or abusive—is beyond [the statute's] purview." *Harris*, 510 U.S. at 21. "Likewise, if the victim does not subjectively perceive the environment to be abusive, the conduct has not actually altered the conditions of the victim's employment, and there is no [statutory] violation." *Id.* at 21-22. Whether a work environment is objectively abusive is determined by considering "all the circumstances," which "may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris*, 510 U.S. at 23; *see Hockman v. Westward Commc'ns, LLC*, 407 F.3d 317, 325 (5th Cir. 2004) ("Whether an environment is objectively hostile or abusive is determined by considering the totality of the circumstances.") (citing *Harris*, 510 U.S. at 23)). "[N]o single factor is required." *Harris*, 510 U.S. at 23. Sexual harassment may give rise to an abusive work environment through either its objective severity *or* its pervasiveness, or some combination of the two, *see Harris*, 510 U.S. at 21, and the level of objective severity in harassment necessary to give rise to an objectively hostile work environment may be said to vary inversely with its pervasiveness, and vice versa. *See Lauderdale v. Texas Dep't of Crim. Justice*, 512 F.3d 157, 163 (5th Cir. 2007) ("[T]he test—whether the harassment is severe or pervasive—is stated in the disjunctive. An egregious, yet isolated incident can alter the terms, conditions, or privileges of employment . . . . The inverse is also true: Frequent incidents of harassment, though not severe, can reach the level of 'pervasive,' thereby alerting the terms, conditions, or privileges of employment such that a hostile work environment exists.") (citations omitted).

21

The Supreme Court has also emphasized that "the objective severity of harassment should be judged from the perspective of a reasonable person in the plaintiff's position, considering 'all the circumstances,'" with "careful consideration of the social context in which a particular behavior occurs and is experienced by its target." *Oncale*, 523 U.S. at 81. It has further observed that "[t]he real social impact of workplace behavior often depends on a constellation of surrounding circumstances, expectations, and relationships which are not fully captured by a simple recitation of the words used or the physical acts performed." *Id.* at 81-82; *see also id.* at 81 (contrasting the examples of a football coach smacking a player on the backside as he heads onto the field versus the coach's committing the same act on a secretary back at the office).

The U.S. Supreme Court has acknowledged that objective abusiveness "is not, and by its nature cannot be, a mathematically precise test." *Harris*, 510 U.S. at 22-23. Nonetheless, it has instructed lower courts to apply objective "abusiveness" as a legal threshold to "filter out" complaints of alleged harassment that are "not actionably severe or pervasive" as a matter of law. *Faragher*, 524 U.S. at 787-88 (approving courts' disposition by summary judgment of claims "attacking the 'ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing'"). Over time, a considerable body of case law has developed as lower federal courts have applied this "filter" to myriad fact patterns and attempted to distinguish facts rising to the level of objective abusiveness from those that do not. The cases are highly fact-specific, often resembling a sort of equitable balancing of the factors identified by the U.S. Supreme Court, and clear or categorical rules are elusive. We may nonetheless glean some guidance by comparing the factual scenarios in prior decisions to our own.

22

We begin by examining the frequency or pervasiveness of Alonzo's alleged conduct. Drawing reasonable inferences in Miller's favor, Alonzo's actionable harassment occurred during only the final forty-nine days before her fourteen-month tenure at Twigland ended in termination.[14] Within that period, she complains of incidents on only five of those days:

- On November 9, during one of her food-court meetings with Alonzo while he was visiting her store, Alonzo asked Miller how many men she had slept with.
- During the same meeting, Alonzo expressed a desire to "be friends" with Miller outside the workplace, insinuated that it would help her career, and insisted that it was "important" that she keep the relationship secret.

- Beginning in a November 11 phone conversation, Alonzo periodically advised Miller, explicitly or with coded references, that she "owed" him "hugs" or "kisses" for her poor job performance.

- During Alonzo's next store visit on December 7— almost one month afterward—Alonzo gave Miller two uninvited full-body hugs from behind for "like maybe a second or so" in a back storage room in the store.

- During a meeting on the following day at Barton Creek Mall, after an argument that Alonzo compared to a "lover's quarrel," Alonzo divulged that he "loved" and "cared" about Miller but acknowledged, "It's just business," and, "Obviously, you don't feel the same." He then indicated that Miller "owed him another kiss and that he would get those kisses when [Miller] least expected."

Miller also indicated that at unspecified times during Alonzo's store visits—which occurred on November 9, December 7, and December 15—Alonzo made "very light, physical contacts" with her "at times when behind the counter would be overcrowded and I would be taking care of customers." She added that during food-court meetings during these visits, Alonzo "would just put his hand on mine." Miller also testified that Alonzo made one of his coded references to accruing "kisses"

---

[14] I.e., beginning November 9, 2005 and ending with her December 28 termination.

during his December 15 store visit. Finally, Miller complains that during their December 28 meeting in which he terminated her, Alonzo cried, bemoaned the "plans" he had "for us," and indicated that he had wanted to take Miller to a restaurant and bar in what could be considered a romantic setting.

Miller acknowledged that Alonzo—who supervised stores in a region extending from Austin to Eagle Pass—was typically in her store only once or twice per month and in fact was in her physical presence during only four days of the forty-nine-day period in which she claimed Alonzo harassed her—the November 9 store visit, the December 7 store visit, the December 8 meeting at Barton Creek Mall, and a December 15 store visit. While Miller insisted that Alonzo's visits to her store would typically last for the entire work day and that their food-court meetings might last hours, it remains that these face-to-face encounters and any alleged harassment occurring on those occasions were relatively infrequent compared to the far more numerous work days in which Alonzo was not around. Miller did not complain of any harassment when Alonzo was not present other than the November 11 phone conversation in which Alonzo purportedly began counting "kisses" or "hugs." Further, while Miller claimed that she perceived her job to be more difficult during the days when Alonzo was in her store, she admitted that she encountered no such impediment "when he was actually not in the store." Thus, even under Miller's subjective view of the impact of Alonzo's conduct on her, it created no impediment to her equal opportunity to succeed in the workplace during at least forty-five of the forty-nine days at issue (not to mention during the preceding year in which Miller worked under Alonzo's supervision yet does not complain of any harassment). *See Meritor*, 477 U.S. at 67; *DeAngelis*, 51 F.3d at 593.

Alonzo's alleged conduct lacks the frequency or pervasiveness that is typically required to establish an actionable hostile-work-environment sexual-harassment claim. *See, e.g.*, *Puckett v. City of Portsmouth*, 391 F. Supp. 2d 423, 427, 436 (E.D.Va. 2005) (three incidents during one month were not sufficiently pervasive to support claim); *Gharzouzi v. Northwestern Human Servs.*, 225 F. Supp. 2d 514, 536 (E.D. Pa. 2002) (six incidents in three months, including one month with three incidents, not sufficiently pervasive to support claim); *Noble v. Monsanto Co.*, 973 F. Supp. 849, 857 (S.D. Iowa 1997) (three incidents in close succession within same year were not sufficiently pervasive to support claim); *Garcia v. ANR Freight Sys., Inc.*, 942 F. Supp. 351, 356 (N.D. Ohio 1996) (three incidents during five-day orientation did not support claim); *cf. Lauderdale*, 512 F.3d at 164 (pervasiveness of perpetrator's ten to fifteen phone calls to victim during victim's shift every night for almost four months reduced victim's burden as to severity).

Although even infrequent harassment may be deemed to alter terms, conditions, or privileges of employment if especially egregious, *see Faragher*, 524 U.S. at 788; *Lauderdale*, 512 F.3d at 163, the conduct of which Miller complains falls below the objective severity courts have required to meet that threshold. Miller admitted that Alonzo never sexually solicited her, asked her to have sex with him, made a sexual advance toward her, or attempted to kiss her. As for the conduct Alonzo allegedly did commit, the case law reveals that an array of shockingly more egregious (and often more pervasive) uninvited physical contact and utterances have been held insufficiently severe to alter terms, conditions, or privileges of employment. *See, e.g.*, *Hockman*, 407 F.3d at 321-22 (in addition to making sexually suggestive remarks, repeatedly insisting that employee be alone with him, and remarking on another employee's body, supervisor over one-and-a-

25

half years brushed up against employee's breast and behind, once tried to kiss her, once stood in bathroom doorway while employee was present, and once swatted employee's behind with newspaper); *Gupta v. Florida Bd. of Regents*, 212 F.3d 571, 578-79, 582-86 (11th Cir. 2000) (during six- to seven-month period, superior made flirtatious comments (e.g., "[y]ou are looking very beautiful"); persistently invited her to lunch, dinner, and drinks; called plaintiff's house at night two or three times per week inquiring into such personal matters as whether she was in bed yet or where her boyfriend was; once placed his hand on plaintiff's inner thigh; once lifted plaintiff's dress about four inches; commented that plaintiff was "innocent and you don't have much [sexual] experience;" and indicated he would have "come and spend [sic] the night with you" during a thunderstorm the previous evening); *Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1247-51) (5th Cir. 1999) (en banc) (over eleven-month period, supervisor was "constant" in following plaintiff and staring at her in a "very obvious fashion," twice made a sniffing sound when looking at plaintiff's groin (and one incident of making a sniffing sound without looking at her groin), once rubbed his hip against hers while touching her shoulder and smiling, and once said to her, "I'm getting fired up"); *Shepherd v. Comptroller of Pub. Accounts*, 168 F.3d 871, 872 (5th Cir. 1999) (co-worker touched victim's arm several times, rubbed arm down to her wrist, simulated looking up her dress, tried to look down her clothing, and made sexually suggestive comments that included referring to color of her nipples and size of her thighs); *Quinn v. Green Tree Credit Corp.*, 159 F.3d 759, 768 (2nd Cir. 1998) (supervisor stated that plaintiff had been "voted the 'sleekest ass' in the office" and, on another occasion, "deliberately touched" plaintiff's breasts with papers held in his hand); *Weiss v. Coca-Cola Bottling Co.*, 990 F.2d 333, 334-35, 337 (7th Cir. 1993) (within three- or four-month

period, supervisor asked employee "about her personal life and compliment[ed] her, telling her how beautiful she was," asked her for dates, placed "I love you" signs in her work area, placed his hand on her shoulder at least six times, and twice tried to kiss her in the workplace); *Garcia v. Schwab*, 967 S.W.2d 883, 885, 887 (Tex. App—Corpus Christi 1998, no pet.) (supervisor stared at and commented on plaintiff's breasts, touched his genitals in front of plaintiff, discussed highly personal and sexual matters with plaintiff, remarked on plaintiff's appearance, and repeatedly made sexual references in attempt to sexually arouse plaintiff); *Green v. Industrial Specialty Contractors, Inc.*, 1 S.W.3d 126, 129, 132-34 (Tex. App.—Houston [14th Dist.] 1999, no pet.) (supervisor made numerous sexual comments, including expressing desire to hold "a wet T-shirt contest" with plaintiff as a contestant);[15] *cf. Itz*, 21 S.W.3d at 462-65, 473-75 (evidence supported hostile-work-environment claim where, within two-month period, supervisor repeatedly called employee at home in evenings to inquire whether she and boyfriend were going out, later promised to put her up in an apartment if she broke up with her boyfriend, complimented her body and legs and caressed her leg from her knees to her ankle during a one-on-one back-room meeting where supervisor seated them face-to-face at close proximity, was "'always hovering around her and following her,'" gave her a "'very forceful'" "'body-to-body'" hug lasting "several seconds," and caressed her leg again during another one-on-one back-room meeting during which he complimented her appearance and

---

[15] *See also Oncale v. Sundowner Offshore Servs. Inc.*, 523 U.S. 75, 81 (1998) ("The prohibition of harassment on the basis of sex requires neither asexuality nor androgyny in the workplace; it forbids only behavior so objectively offensive as to alter the 'conditions' of the victim's employment. . . . We have always regarded that requirement as crucial, and as sufficient to ensure that courts and juries do not mistake ordinary socializing in the workplace—such as . . . intersexual flirtation—for discriminatory 'conditions of employment.'").

27

encouraged her to break up with her boyfriend); *Wal-Mart Stores, Inc. v. Davis*, 979 S.W.2d 30, 34, 41-44 (Tex. App.—Austin 1998, pet. denied) (evidence supported hostile-work-environment claim when supervisor "began the complained-of course of conduct by acts such as commenting that [plaintiff] looked good in jeans, standing too close, rubbing her arms, and poking her ribs;" would force plaintiff to climb ladders on days she was wearing a skirt and "would tell her to climb higher so he could get a better view;" informed others at a company event, in plaintiff's husband's presence, that supervisor "had wanted [plaintiff] to wear a short skirt and bend over so that [supervisor] would have something to look at;" and twice during one-on-one meetings in supervisor's office, supervisor placed his chair in front of hers and pinned her knees together with his legs, grabbed her upper thighs, and refused to let go, on one occasion holding on "for two or three minutes").

In arguing that the objective severity of Alonzo's conduct rises to the level of altering terms, conditions, or privileges of her employment, Miller emphasizes the two December 7 hugging incidents. Miller recounted that she was "kind of like halfway bent down" when Alonzo approached "and just gave me this really tight hug" while uttering "some comment about the holiday." Miller claimed that "all of his body" came into contact with hers, with his arms "in front of me," in a manner that "I would probably get from a spouse or a boyfriend." This embrace, according to Miller, "lasted like maybe a second or so" before she "broke loose as fast as I could." Alonzo then gave her another similar hug a few minutes later. While no doubt highly offensive to her, we cannot conclude, in light of the foregoing cases, that these two isolated and brief incidents, alone or in combination with Alonzo's other alleged conduct, would be considered the sort of objectively severe conduct that would be deemed to alter the terms, conditions, or privileges of Miller's employment.

28

*See Hockman*, 407 F.3d at 321-22 (supervisor's breast-grabbing, attempted kiss, sexually suggestive remarks, and insistence that employee be alone with him not enough); *Quinn*, 159 F.3d at 768 ("deliberate[] touch[ing]" of breasts with papers not enough); *Paul v. Northrop Grumman Ship Sys.*, 309 F. App'x 825, 826-29 (5th Cir. 2009) (per curiam) (not enough that male foreman "chest[ed] up" to female employee's breasts in thirty-second confrontation, then followed employee through narrow passageway, placed his hands on her stomach, ran his arm around her waist, and "'rubbed his pelvic region across [her] hips and buttocks'" for a minute or more; noting that court had held that similar "non-pervasive conduct involving physical touching—including unwanted touching of intimate body parts—[is] not actionable under Title VII." (citing cases)).

Miller also relies on the concept that because Alonzo was her supervisor, his conduct was invested with "a particular threatening character" due to his "power and authority" over her. *Ellerth*, 524 U.S. at 763. However, nearly all of the preceding cases we have discussed involved conduct by supervisors that would carry with it the explicit or implicit threat of job-related repercussions. We also note that each of the incidents of which Miller complains, with the exception of the December 7 hugging incident and the November 11 phone conversation, occurred in public view, in public areas of shopping malls or Miller's retail store. Even the hugging incident, the evidence reflects, occurred in a back storage room located a few feet from the retail area and while the Twigland company president was in the retail area. Additionally, Miller admitted that she knew Twigland had a written anti-sexual-harassment policy that permitted (indeed, required) her to report any such conduct to the company's human-resources department. Although Miller attacked the effectiveness of Twigland's sexual-harassment policy in challenging whether Twigland

29

met its burden of establishing that it exercised "reasonable care" to prevent and correct harassment—the first element of its *Faragher/Ellerth* affirmative defense, *Faragher*, 524 U.S. at 807; *Ellerth*, 524 U.S. at 765—it remains undisputed that Miller never attempted to avail herself of this protection. *See Barrett v. Applied Radiant Energy Corp.*, 240 F.3d 262, 268 (4th Cir. 2001) ("An employee's subjective belief in the futility of reporting a harasser's behavior is not a reasonable basis for failing to take advantage of any preventive or corrective opportunities provided by the employer.").

Finally, we consider the extent to which Alonzo's conduct unreasonably interfered with Miller's work performance. *See Harris*, 510 U.S. at 23. Twigland places great emphasis on Miller's admissions that her job performance had not only been unharmed by Alonzo's alleged conduct, but actually improved. It suggests that the absence of any harm to Miller's job performance singularly forecloses her claim. This overstates what the U.S. Supreme Court has actually held. *See Harris*, 510 U.S. at 22 ("[E]ven without regard to . . . tangible effects [on employees' job performance, retention, or advancement], the very fact that the discriminatory conduct was so severe or pervasive that it created a work environment abusive to employees because of their race, gender, religion, or national origin offends Title VII's broad rule of workplace equality."). Nonetheless, Miller's admissions are significant in determining whether, from the perspective of a reasonable person in Miller's position, Alonzo's conduct created a work environment so abusive that it constituted an alteration of the terms, conditions, or privileges of her employment. Also, while Miller did testify to her subjective impressions that Alonzo's presence in her store was distracting and made her job more difficult, she conceded that these impediments arose only "[w]hen [Alonzo]

30

was in the store, but not when he was actually not in the store." Again, Alonzo was in Miller's physical presence on only four days during the forty-nine-day period in which he allegedly harassed her.

Guided by the foregoing jurisprudence, we must conclude that Miller has not presented legally sufficient evidence that any sexual harassment by Alonzo rose to the level of altering the terms, conditions, or privileges of her employment and "creat[ing] an abusive working environment." *Harris*, 510 U.S. at 21 (quoting *Meritor*, 477 U.S. at 67). Again, the point of a hostile-work-environment sexual-harassment claim under section 21.051 or Title VII is not to combat sexual harassment as an end in itself, however reprehensible such harassment may be, but to provide a remedy when sexual harassment rises to a level so "extreme" and "abusive" that it deprives the victim of equal opportunity in the workplace. *See Meritor*, 477 U.S. at 67; *DeAngelis*, 51 F.3d at 593. Considering the infrequency of Alonzo's alleged conduct, its lack of relative severity, and the limited degree to which it impacted Miller's work performance, Miller has failed to raise a fact issue that she suffered such a deprivation as understood in the applicable jurisprudence.

Emphasizing the language of the two-judge panel of this Court in *Davis*, Miller urges that because "gender relations in the workplace are rapidly evolving, and views of what is appropriate behavior are diverse and shifting, a jury made up of a cross-section of our heterogenous communities provides the appropriate institution for deciding whether borderline situations should be characterized as sexual harassment . . . ." *Davis*, 979 S.W.2d at 43 (quoting *Gallagher v. Delaney*, 139 F.3d 338, 342 (2d Cir. 1998)). That statement, as *Davis* acknowledges, presumes

that there is legally sufficient evidence to support submitting the issue to the jury. *See id.* The evidence falls below that threshold here. We sustain Twigland's first issue.

**CONCLUSION**

Our disposition of Twigland's first issue requires us to reverse and render judgment that Miller take nothing on her claim. We need not reach Twigland's other appellate issues. *See* Tex. R. App. P. 47.1.

_____

Bob Pemberton, Justice

Before Chief Justice Law, Justices Puryear and Pemberton;
    Chief Justice Law Not Participating

Reversed and Rendered

Filed:  March 11, 2010